# LOGAN CITY v. PUBLIC UTILITIES COMMISSION OF UTAH et al.

No. 4679.   Decided November 24, 1928.   (271 P. 961.)

*Leon Fonnesbeck,* of Logan, for Logan City.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal Farr,* Asst. Atty. Gen., for the Commission.

*John F. MacLane* and *George R. Corey,* both of Salt Lake City, for Utah Power & Light Co.

*Young & Bullen,* of Logan, for intervening taxpayers.

STRAUP, J.

This cause involves a review of proceedings before the Public Utilities Commission, wherein, among other things, it fixed the rate to be charged by Logan City in furnishing through an electrical plant owned and operated by it electrical energy to inhabitants of the city for lighting, domestic, and commercial purposes. On a prior submission of the cause, and on a review of the proceedings by this court, consisting of four members, an opinion concurred in by three of them, one dissenting, was filed, annulling the order of the commission. On application for a rehearing, on the ground that the judgment so rendered by us was erroneous and that the parties interested were entitled to a review by a full bench, consisting of five members, a rehearing at large was granted. A district judge was thus called in to sit in lieu of the disqualified member of this court. The case was thereupon reargued and resubmitted. On a re-examination and further consideration of the record, and upon further argu-

ments and briefs of counsel four members of the court, one member dissenting, are of the opinion that the order of the commission should be annulled and vacated, on grounds and for reasons stated in opinions now filed, which supersede the opinions heretofore filed in the cause.

Logan City owns and operates its own electric plant and distributing system, by means of which electrical energy is furnished and supplied to light its streets and public buildings and for use of inhabitants of the city for lighting, heating, cooking, and for other domestic and commercial purposes. The Utah Power & Light Company is a public utility owning and operating a number of extensive hydroelectric and interconnected generating plants, transmission and distributing systems in and throughout the state, among which is a plant owned and operated by it at or near Logan City, by means of which it also furnishes and supplies inhabitants of the city for the same uses and purposes for which the city furnishes and supplies electrical energy. The real controversy is one between the city and the company.

The first electrical plant built and operated at or near Logan, by means of which the inhabitants of Logan City were furnished and supplied electrical energy, was built by Lundberg & Garff some time prior to 1890. At that time the city acquired the plant from them, and operated it in furnishing and supplying electrical energy to the inhabitants of the city. In about 1896 or 1897 the predecessors of the Utah Power & Light Company built and operated an electrical plant at or near Logan City, by means of which they also furnished energy, among others, to the inhabitants of Logan City, for all general purposes. Later they or the company acquired the plant owned and operated by the city. Soon after the plant was acquired from the city, the company or its predecessors raised the rates or charges for electrical energy furnished inhabitants of the city to 75 cents per month for each 40-watt lamp on a flat rate service. That continued until 1903, when the city, claiming that the charge

was excessive and that the energy could be furnished for 33⅓ cents per 40-watt lamp, voted and issued bonds to build and operate the city's present plant and distributing system.

As soon as the city's plant and system was built, and the city began to furnish and supply inhabitants of the city with electrical energy at the reduced rate, the company reduced its rate to a flat rate of 10 cents per kilowatt hour per month for lighting purposes. The city thereupon reduced its rate to 15 cents. The rates of both for other purposes was less, but all service was on a flat or unmeasured rate. Such operations on a flat rate basis continued until the early spring of 1927, when the city and the company, recognizing that the service of both on a flat or unmeasured rate caused a great waste and an extravagant use of electrical current and energy, agreed to abandon the service on a flat rate, to install meters, and to change from the one to the other system by September 1, 1927.

In pursuance of the agreement the city solicited and procured about 1,400 customers, inhabitants of the city, and entered into a written contract with them to serve them, and were ready to serve all other inhabitants of the city who desired to purchase electrical energy from it on a meter basis, the city to furnish the meters at its own expense, and to supply electrical energy for a period of 3 years at a rate of 5 cents per kilowatt hour for the first 50 kilowatt hours consumed per month for lighting purposes, 4 cents for the next 150 kilowatt hours, 3 cents for all electricity used over and above 200 kilowatt hours per month, with 10 per cent discount on prompt payment, 2 cents per kilowatt hour for all monthly consumption for general heating and cooking purposes, with 5 per cent discount for prompt payment, 5 to 2 cents per kilowatt hour up to a monthly consumption of 1,200 kilowatt hours, and one cent in excess thereof, with 5 per cent discount for prompt payment for general power purposes. In pursuance of the agreement the city also, at great expense, procured and installed meters for its custo-

mers, and made necessary changes and improvements in its distributing system to put it on a meter basis.

Among its customers so procured, and who entered into contracts with the city to take electricity on a meter basis, and for whom meters were installed, were a number who, prior thereto, had been customers of the company. Such prior customers, by written notice to the company, notified it that they had entered into contracts with the city to take electrical energy from it on a meter basis, and requested the company to remove its wires and equipments on their premises. The company, in some instances, declined to do so unless such customers appeared in person at the company's office. Agents and servants of the company, at Logan, in some instances gave out to customers of the company that it had no intention of going on a meter basis, and that it would continue to furnish and supply its customers, and all others who desired to take electricity from it, on a flat or unmeasured rate or charge, and at which it had theretofore furnished and supplied its product in Logan City, and that the company had not indicated to them any intention to go on a meter basis service. Some of the customers, who had signed contracts with the city to purchase electrical energy from it on a meter basis, and preferring a service on a flat instead of a meter rate, declined to go on with their contracts with the city, claiming that they had entered into the contracts with the understanding that both the company and the city were to go on a meter basis.

Thereupon the city filed a petition with the Public Utilities Commission of the state, alleging the foregoing and other facts; that a flat rate service caused a waste and an extravagant use of electricity, a detriment and a needless expense to both the city and the company, and asked that a hearing be had and that the company be required to abandon its flat or unmeasured rate service and install a meter system. The city by its petition did not, nor did it otherwise, ask that the commission fix a rate or charge, either for it-

self or for the company. All it did was to petition the commission, for the reasons stated in the petition, to require the company to abandon its service on a flat or unmeasured rate and install a meter system in Logan City.

The company answered the petition, admitting that a flat or unmeasured rate service led to a waste of electrical energy and to an extravagant use of it; that the flat rate system was improper and should be abandoned, and that the service ought to be on a meter system basis; and that the company was willing to abandon its flat rate service and go on a meter basis, provided reasonable rates or charges were established by the commission for both the city and the company, in lieu of the flat rate theretofore charged. The company further alleged that the meter rates fixed and adopted by the city were unjust, unreasonably low, and below cost of service; that the rate so fixed by the city, if applied to the systems of both the company and the city, would produce a less gross revenue than the rates theretofore charged on a flat rate service, and would not produce a sufficient revenue to pay expenses of operation, maintenance of the plant, interest charges, and provide for a sinking fund, and that, if the city be permitted to establish and carry out its proposed rate, the company, in order to continue in business, furnishing electrical energy to inhabitants of the city, would be required to meet such rate, which would result in a great loss to it, and to a destruction of its business.

Forty-six taxpayers of the city, customers of the company, filed a petition in intervention, in which they alleged, on information and belief, that the proposed rate or schedule of meter rates of the city were inadequate to pay operating and maintenance expenses of the city's plant, interest on bonds floated for the construction of the plant, and a sinking fund for the payment of the bonds; that for many years such petitioners, being taxpayers of the city, were taxed to maintain the city's plant, and to make up a deficit resulting from the operation of its plant on a flat rate basis, and if the

proposed rate of the city should be permitted large deficits would continue to exist from the operation of the city's plant, which would have to be met by taxation, and that they desired to have a rate or charge fixed for the city sufficiently high to meet all costs and expenses, interest payments on and a sinking fund for payment of the bonds, so that a sufficient revenue would be obtained from charges of operation without requiring a levy of taxes.

Seven hundred and sixty taxpayers of the city filed a counter petition in intervention, in which, among other things, they alleged that the flat rate system was wasteful and led to an extravagant use of electrical currents, and to a loss to both the city and the company; that the city, in pursuance of contracts entered into with it, had installed meters in more than 1,400 homes and business places of citizens and taxpayers of the city; that it was to the best interest of the citizens of the city to go on a meter basis, and on the rates as fixed by ordinance and resolution of the board of the city commissioners, and that the board's action in such respect met the approval of over 90 per cent of the voters and taxpayers of the city; that the petition filed by the intervening customers of the company was filed to hinder and obstruct the city in conducting its plant, and to aid the company; that it was the desire of a great majority of the citizens and taxpayers of the city that the city be permitted to carry out its agreements, and that the rates and charges proposed by it be neither increased nor decreased.

The city demurred to the answer of the company, among other things challenging the power and jurisdiction of the commission to fix rates or charges to be charged by the city in furnishing electrical energy for the use of the city and its inhabitants by means of the plant owned and operated by it exclusively for such purposes. It also filed a reply, denying all affirmative matters stated in the answer, and alleged that on the meter rates fixed by it sufficient revenues would be derived to meet all operating and maintenance expenses,

pay interest on its bonds, and provide a sinking fund to pay the principal of the bonds, and denied that the rate or charge fixed by it was unjust or unreasonable, or below cost of service, as in the company's answer alleged. It further averred that, prior to the city building and constructing its plant and its distributing system in 1903, the predecessor of the company charged an unreasonably high rate of 75 cents per month for a 16-kilowatt lamp, but immediately after the city had built its plant and distributing system and furnished citizens of the city electrical current at the rate of three lamps for $1 per month, the predecessor of the company reduced its flat rate to 20 cents per month for each 16-kilowatt lamp, and when the city met that rate the company further reduced its rate to 10 cents per 16-kilowatt lamp per month, which rate was also met by the city until 1909, when it raised its rate to 15 cents per lamp per month, which rate was maintained by the city until in March, 1925, when it again reduced its rate to 10 cents per month per 40-watt lamp; but that the company continued to maintain its flat rate of 10 cents per 40-watt lamp per month, and for larger lamps in proportion, and that to permit the company to continue its flat or unmeasured rate of service would result in an irreparable loss to the city and of its municipal plant.

Upon these issues a hearing was had before the Public Utilities Commission, the city objecting to the commission proceeding to hear or determine or fix any rate or charge for it, and challenging the power and jurisdiction of the commission to so interfere with its municipal and corporate affairs. All of the objections were either overruled or disregarded by the commission; it in effect holding that Logan City, in operating and conducting its plant, was a public utility within the meaning of the Public Utilities Act (Comp. Laws 1917, § 4775 et seq.), and subject to the same supervision, regulation, and control by the commission as was any private or public utility company or corporation. Evidence was adduced by the city to show the necessity of the city to build and operate its municipal plant to protect itself

against what it claimed to be excessive charges, and as in its petition and reply alleged; that the flat rate service practiced by both the city and the company resulted in waste, and in an extravagant use of electrical currents furnished consumers, and a loss of revenue to both the city and the company; the agreement entered into between the city and the company to abandon the flat rate service and go on a meter system basis; the ordinance and resolution adopted by the board of commissioners of the city to go upon a meter system basis, installing meters, and fixing a meter rate or charge, as in the petition of the city alleged; the expenses incurred by the city in installing meters, and in improving and changing its distributing system to adapt it for such purpose; procuring and entering into numerous contracts with citizens and tax-payers of the city to furnish and supply them with electrical current for a period of three years at the rate or charge alleged in the petition of the city, a number of whom were prior customers of the company; the refusal of the company to go on a meter basis, and its continuing to furnish electrical current on its theretofore flat rate service, agents and servants of the company at Logan City giving out that the company did not intend to go on a meter service basis; the refusal of the company, in some instances where its prior customers had contracted with the city to purchase from it electrical current on a meter basis, to remove wires and equipment of the company; and the refusal of some customers of the city, who had entered into contracts with it, to go on with their contracts, because the company had not gone on a meter basis, as to all of which there is no substantial conflict in the evidence.

That no counter evidence as to such matters was offered may, however, be assumed was largely because of views urged by the company that all such matters were immaterial, and that the rate fixed by the city and the contracts entered into between it and its customers were in so far as the Public Utilities Commission was authorized to fix and determine a reasonable rate or charge, of no binding effect and could

be, as they were, wholly disregarded, though neither party to any of the contracts was complaining or seeking any relief with respect to any of the terms of the contract. Evidence, however, was also adduced by the city to show that the meter rate fixed by it would, as estimated by it and as shown by the short time that electrical currents were furnished by it on a meter basis, raise sufficient revenue to pay the operating and maintenance expenses of the plant, interest on the bonds, and provide a sinking fund with which to pay the principal of the bonds when they mature. On the contrary, considerable evidence was given on behalf of the company and of its intervening customers to show that the rate fixed and proposed by the city would not raise sufficient revenue to maintain and provide all of such expenses and conditions, and that the adoption of such rates and charges by the city as proposed by it necessarily would result in deficits, which would have to be met by taxation as theretofore had to be done on a flat rate service.

The commission found all of such contentions against the city, and that the annual revenues based on the number of its customers as of September 1, 1927, and on its proposed meter rates, would be only about $41,819.18, and that its operating expenses would be approximately $37,642.16, leaving not anything for depreciation, or interest on its bonded indebtedness, nor for a sinking fund, nor to meet other contingencies that might arise. The company, and especially its intervening customers, among whom were bankers and others engaged in commercial enterprises in the city, and among them some of the largest taxpayers of the city, urged that the commission fix a rate to be charged by the city which would produce for it a sufficient revenue with which to pay all operating and maintenance expenses, interest on its bonds, provide for a sinking fund to pay the principal of the bonds when they mature, and a reasonable allowance for depreciation of the city's plant, so that there would be no necessity for the city in the future to levy or collect any taxes for any such purposes.

The commission in the main found that the city was required to do so, and that the rate proposed by it would not meet such requirements. It found that the equities of the case were with the contention of the intervening customers of the company, and that so long as taxpayers were required to continue to pay taxes to maintain and operate the city's plant, in order that its customers may be served with electrical energy below cost to the city, the rates established by the city were unjust, unreasonable, and in violation of law. It further found that the flat rate service was extravagant and wasteful, and not an economical or a proper method of service, and as was conceded by both the city and the company. The commission thus ordered that both the city and the company abandon the flat or unmeasured rate service, and adopt a meter system service. It further found that, until the flat rate service was abandoned by both the city and the company, and the meter system adopted by both, it was uncertain just what the consumption of electrical energy in the city would be. It, however, found that the rate proposed by the city was unreasonably low and unjust, and would not raise sufficient revenue to meet all of the expenses and conditions hereinbefore indicated.

Evidence also was heard by the commission and findings made by it as to the amount of capital invested by the city in its plant and system, its present bonded indebtedness, the amount of interest payments, and the amount necessary to provide for the payment of its bonds when they mature, the cost and expenses of operation and maintenance of the city's plant, and a reasonable allowance for depreciation. No evidence was given, and no findings were made, with respect to such matters as to the company. While the commission also fixed a rate to be charged by the company, it received no evidence as to the amount of capital invested in its plant at Logan City, nor as to its costs or expenses of operation or maintenance, nor for depreciation, nor as to it did it take any evidence as to any of the usual elements considered in fixing a rate to be charged by a public utility company. In

fixing the same rate or charge for both the city and the company, the commission but took the standard rate and charge, which the company charged throughout the state under similar conditions. It, however, made no finding that under all the conditions and circumstances such a rate was a fair and reasonable rate to be charged by the company. The commission but stated that the reasonableness of the standard rate of the company was not challenged.

That the rate so fixed by the commission was the standard rate of the company was not disputed. But that such a rate or charge was a reasonable or proper rate or charge for the city, or that such a rate or charge was necessary to meet the requirements of the city, even as found by the commission, was disputed. That was one of the material issues of the controversy before the commission; the city contending, and the company disputing, that the rate or charge proposed by the city was sufficient to meet all such requirements. Nor did the commission find that a lower rate or charge than the standard rate of the company would not meet all such requirements of the city. It did not find nor consider whether a municipality (owning and operating a utility for its own use and for the use or benefit of its inhabitants, and not for gain and profit, but only at cost and free from taxation, franchise and license fees might or might not be able to furnish and supply the product of its utility at a rate or charge less than a public utility company operating its plant for gain or profit, and required to pay taxes on its property, costs of franchises, easements, license privileges, etc. In other words, the commission, regardless of whether a municipality, owning and operating its own plant not for gain or profit, might or might not be able to furnish and supply its inhabitants with the product of its utility at a rate or charge less than a public utility company might do, in fixing a rate or charge for the city, took into consideration substantially the same factors and elements usually considered in fixing a rate or charge for a public utility company operating for gain and profit, chiefly the amount of capital in-

vested, operating and maintenance expenses, depreciation of the plant, other necessary contingencies, and a reasonable rate of interest on the amount of capital invested, or a reasonable net profit of the business.

Evidence also was given to show that some of the cities of the state and a number of cities elsewhere, owning and operating their own plants, furnishing and supplying their inhabitants with electrical energy on a meter basis, furnished and supplied it at about the same rate proposed to be charged by Logan City. Evidence also was given to show what the standard rate or charge was that was charged by the company in furnishing and supplying electrical energy on a meter basis under similar conditions to cities and towns and to the inhabitants thereof elsewhere in the state, which was 10 cents per kilowatt hour for the first 250 kilowatt hours per month consumption, 9 cents for the next 250 kilowatt hours, 8 cents for the next 250, 7 cents for the next 250, 6 cents for the next 250, and 5 cents per kilowatt hour for all additional kilowatt hours of monthly consumption in excess of 1,250 kilowatt hours. It was estimated that the average monthly consumption of customers in the city would be less than 250 kilowatt hours.

The commission thus ordered that the city be required to charge the same rate as the standard rate charged by the company, and fixed and determined such a rate for both the city and the company, and annulled and vacated all contracts with respect to rates, charges, and service entered into by the city or the company with its customers.

On aplication of the city, we issued a writ of certiorari to review the proceedings before the commission. It is the contention of the city (1) that a municipality owning and operating its own plant, and furnishing electrical energy for its own use, and for the use of inhabitants of the city, is not a public utility, within the meaning of the Public Utilities Act, and that thus the commission had no authority to fix or determine a rate or charge to be charged by the city; (2)

that, if it be held such a municipality is within the act, and thus power conferred upon the commission to fix rates and charges, and supervise, regulate and control the business and affairs of a municipality in such particular, and to the same extent that it may fix rates and charges, and supervise, regulate, and control the business and affairs of public utilities as prescribed by the act, then the act in such respect is in conflict with section 29, art. 6, of the Constitution of the state, and constitutes an unlawful interference with private municipal corporate affairs and functions of the city; (3) that, though it be held there is no such conflict, yet the commission, in fixing the rate to be charged by the city, exceeded its jurisdiction and irregularly pursued its authority by fixing and determining a charge or rate on a wrong and on an unauthorized basis; (4) that the commission, in ruling that a charge or rate sufficiently large was required to meet all expenses of operation of the plant, interest on its bonds, and a sinking fund, and all other contingencies as by the findings indicated, without levying any tax for any such purpose, likewise exceeded its authority and disregarded statutes of the state in such case made and provided; and (5) that the commission was unauthorized to annul or vacate the contracts entered into by the city with its customers, and with whom it had contracted to furnish electrical energy.

The Public Utilities Act (Comp. Laws Utah 1917) was passed in 1917. By section 4782 of that act it is provided that the term "corporation," as used in that act, includes, among other corporations, municipal corporations; that the term "municipal corporations" includes cities, towns, and municipalities; that the term "electrical corporation" includes "every corporation or person, their lessees, receivers, or trustees appointed by any court whatsoever, owning, controlling, operating, or managing any electric plant, or in any wise furnishing electric power for public use within this state, except where electricity is generated on or distributed by the producer through private property alone, solely for his own use or the use of his tenants and not for

550

sale"; that the term "public utility" includes "every common carrier, gas corporation, * * * electric corporation, * * * water corporation, heat corporation, * * * where the service is performed for or the commodity delivered to the public or any portion thereof"; and that the term "public or any portion thereof, * * * means the public generally, or any limited portion of the public including a person, private corporation, municipality, or other political subdivision of the state, to which the service is performed or to which the commodity is delivered," etc.

At that time there was in force a statute (chapter 3, title 16, Comp. Laws Utah 1917) which, among other things, authorized cities to control the finances and property of municipal corporations; to construct and maintain waterworks, gas works, electrical works, etc., or to purchase or lease any or all of such works; to contract with and authorize any person, company or association to construct gas works, electrical or other lighting works in the city; to regulate the sale and use of gas and electric or other lights and electric power charged therefor within the municipality; and to borrow money and issue bonds on the credit of the municipality for corporate purposes; and chapter 25 of the same title, relating to "Bonding for Water, Light, or Sewers," authorizing a city or town to incur indebtedness (not exceeding a stated aggregate), to issue bonds to supply the city or town with water, artificial light or sewers, when the works for supplying such water, light and sewers are owned *and controlled* by the municipality, prescribing the manner of voting for and issuing such bonds, and by section 794 of that chapter, providing that—

"the city council or the board of trustees, as the case may be, shall provide by ordinance for the issuance and disposal of such bonds: *Provided,* that no such bonds shall be sold for less than their face value. The city council or board of trustees, as the case may be, *shall annually levy a sufficient tax to pay the interest on such indebtedness, as it falls due, and also to constitute a sinking fund for the payment of the principal thereof* within twenty years from the time of contracting the same." (Italics added.)

In 1921, three years after the Public Utilities Act was adopted, section 794, Comp. Laws Utah 1917, relating to bonding for water, light, or sewers, was amended (Laws Utah 1921, c. 19) so as to read:

"The board of commissioners, city council or board of trustees, as the case may be, shall provide by ordinance for the issuance and disposal of such bonds, provided that no such bonds shall be sold for less than their face value. The board of commissioners, city council, or board of trustees, as the case shall be, *shall annually levy a sufficient tax to pay the interest on such indebtedness as it falls due and also to constitute a sinking fund* for the payment of the principal thereof within the time for which such bonds are issued. Water or sewer bonds may be issued for a term not exceeding forty years. All other bonds may be issued for a period not exceeding twenty years. Such bonds may be either serial or term bonds." (Italics added.)

That section was again amended in 1925. Laws Utah 1925, c. 58. The amendment took effect March 12, 1925, seven years after the adoption of the Public Utilities Act. The section as amended is in the exact language of the section as amended in 1921, with the only change that, after the words "water or sewer bonds," the words *"or any bonds issued to refund such bonds"* are inserted. At the same session of the Legislature, in 1925, section 794 was further amended by chapter 63, Laws Utah 1925. This amendment took effect March 13, 1925, the next day after the section as amended by chapter 58 took effect. It is as follows:

"The board of commissioners, city council or board of trustees, as the case may be, shall provided by ordinance for the issuance and disposal of such bonds, provided that no such bonds shall be sold for less than their face value. The board of commissioners, city council, or board of trustees, as the case may be, shall annually levy a sufficient tax to pay the interest on such indebtedness as it falls due and also to constitute a sinking fund for the payment of the principal thereof within the time for which such bonds are issued: *Provided that whenever bonds shall have been issued for the purpose of supplying any city or town with artificial light, water or other public utility, the rate or charges from the operation of the system or plant constructed from*

*the proceeds of such bonds may be made sufficient to meet such payments, in addition to operating and maintenance expenses, and taxes shall be levied to meet any deficiencies.* Water or sewer bonds may be issued for a term not exceeding forty years. All other bonds may be issued for a period not exceeding twenty years. Such bonds may be either serial or term bonds." (Italics added.)

The change made in chapter 58 by chapter 63 are the words italicized in chapter 63 just quoted. By chapter 58, as well as by the act of 121, cities or towns by their boards or councils *were required to levy taxes to meet interest payments on and the principal of bonds.* By chapter 63 they are given an *option or discretion* to meet such payments by taxation, or by charges from the operation of the plant.

It is the contention of the company that by reason of the provisions of the Public Utilities Act, defining the terms "municipal corporation," "electric corporation," and "public utility," all municipal corporations owning and operating a system of waterworks, gas, or electric light plants, etc., though only for the use and benefit of the municipality and of its inhabitants, are "public utilities," and thus subject to supervision, regulation, and control by the commission in the conduct of such business, including the fixing of rates and charges, to the same extent that the commission is authorized to supervise, regulate, and control and fix rates and charges of any public utility doing business in the state.

On the other hand, it is the contention of the city that by the Public Utilities Act it was not the intention of the Legislature to include municipalities owning and operating their own plants, or utilities when operated only for the use of the municipality and of its inhabitants, and that it was not the intention to confer power or jurisdiction on the commission to interfere with, or regulate, or control municipalities with respect to such corporate affairs; that, while the Public Utilities Act has taken from municipalities the power to fix rates and charges of public utilities doing business

within the limits of a city or town, and conferred such power on the commission, yet it has not conferred any such power with respect to waterworks or electric light or other utility plants owned and operated by the city or town for its own use and for the benefit of its inhabitants, *and that the Legislature did not do so is manifested by the acts referred to and passed subsequent to the Public Utilities Act.*

Looking alone to the definitions referred to of the Utilities Act, there is much force to the contention that municipalities owning and operating their own plants are included within the act. Still such a conclusion seems inconsistent with the subsequent acts of the Legislature referred to. Laws of Utah 1921 and chapter 58, Laws of Utah 1925, require the city commission or board of trustees of the city or town to levy a sufficient tax to pay interest on the bonds as it falls due, and also to provide a sinking fund for the payment of the principal of the bonds issued and sold to construct and operate a waterworks system or electric light plant, etc. Thereunder such payments may be met *only by taxation.* Such statutes, requiring the levy of a tax for such purpose, seem to be mandatory. To give the Utilities Commission authority to fix rates and charges for such purpose, as well as for operating and maintenance expenses, is, in effect or indirectly, to give it power to levy taxes or not to levy them. In other words, if the commission has power to fix rates and charges for a city owning and operating its own plant, it may fix rates and charges sufficiently high to meet all interest on and principal of the bonds of the city, as well as its operating and maintenance expenses, and thus the commission may determine, as in fact it here did, that the rate should be sufficiently high as not to require the levy of any taxes. Yet such statutes referred to are mandatory that the interest on and the principal of the bonds shall be raised by taxation.

When we look at chapter 63, Laws Utah 1925, an option or discretion is given the city commission or board of trustees

to pay the interest on and principal of the bonds either by taxation or from revenues derived from operation of the plant, as well as to meet all operating and maintenance expenses, *and if there be any deficiency to meet the deficit by taxation.* So, whether the interest on and principal of the bonds shall be raised and met by taxation, or from charges from operation of the plant, is a discretion given the city, and not the Utilities Commission. But here the Utilities Commission itself exercised the option, and determined that all of such payments, as well as operating and maintenance expenses, must be met from revenues produced from charges of operation, and that a rate or charge which does not produce a revenue sufficient for such purpose is unreasonable, unjust, and in violation of law.

It is believed that it was not the intention of the Legislature to delegate, or that it had delegated, such a power to the commission. It is argued that, though the commission does, as it here did, require the municipality to make a rate or charge sufficiently large to meet all expenses of operation, maintenance, interest on bonds, a sinking fund, and other contingencies, yet that does not deprive or forbid the city from levying a tax for all such purposes, as under the statute it admittedly may do; for, as is argued, the revenues so derived from rates and charges may partly or wholly be turned in and applied to the general fund of the city, and then taxes may be levied and collected by it to meet operating and all other expenses of the plant and interest on bonds, and for a sinking fund. We need not now consider whether a municipality is authorized to so apply revenues derived from charges of operation of the plant and then levy taxes for plant purposes. That such was not intended is clearly shown by chapter 63, Laws Utah 1925, providing that, when the city (not the commission) elects to meet expenses of operation of the plant, as well as interest on bonds and for a sinking fund from charges of operation, it shall levy a tax only for a deficiency.

Thus the acts subsequent to the Utilities Act are, as we think, indicative of an intention that the power of a municipality owning and operating its own utility to fix and determine its own rates and charges, and what interest payments on and principal of bonds shall or may be met by taxation and what not, was not intended to be and was not disturbed by the Utilities Act, and that the municipal power in such respect remained after as before the Utilities Act was adopted. The view that municipalities owning and operating their own plants were not intended to be included within the Public Utilities Act is also supported by several provisions of the Utilities Act itself, among them that each public utility is required to have an office in the county of the state in which its property or some portion thereof is located, shall keep in such office all such books, accounts, papers, and records as shall be required by the commission to be kept within the state, and not to remove any from the state except upon conditions as may be prescribed by the commission, giving the commission, its agents and employes, the right at any time and at all times to inspect all accounts, books, papers, and documents of a public utility; providing that every public utility, when ordered by the commission, *before entering into any contract for construction work or for the purchase of any facilities, or with respect to other expenditures, to submit such proposed contract, purchase, or other expenditure to the commission for its approval,* and, if disapproved by it, it may order other contracts, purchases, or expenditures in lieu thereof for any legitimate purpose and economical welfare of the utility; requiring every public utility when required by the commission to deliver to the commission copies of any and all maps, profiles, contracts, agreements, franchises, reports, books, accounts, papers, and records in its possession or in any way relating to its property or affecting its business, matters wholly inapplicable to and inconsistent with the regular and due administration of municipal affairs. It thus is somewhat difficult to perceive that by the Utilities Act it was intended that a

municipality and its taxpayers, though authorized to issue bonds for the construction of and to own, operate, and manage waterworks, electrical and other utility plants, to enter into contracts, purchase facilities, incur expenses with respect thereto, to determine whether interest on and principal of bonds shall be met by taxation or by charges from operation, yet, before doing so, are required to get the approval of the Utilities Commission and turn over to it the direction and control of such municipal corporate affairs and functions.

For such reasons it may well be held that a municipality, owning and operating its own utility plant for its own use and for the use of its inhabitants, was not intended to be a public utility within the meaning of the Utilities Act, giving the commission supervision, direction, and control over such municipal corporate affairs and functions. The act does not eo nomine declare, as do some acts, that a municipality owning and operating its own utility is a "public utility" within the meaning of the Utilities Act. It is only by considering definitions and making deductions from them that such a conclusion is reached, and, too, one which as has been seen, is inapplicable to other provisions of the Utilities Act, inconsistent with subsequent acts of the Legislature, and, as presently will be noted, repugnant to section 29, art. 6, of our Constitution. And on familiar rules of construction, if two meanings or constructions may fairly be given an act, one rendering it in harmony, and the other in conflict with the Constitution, the former should be adopted.

Though it be assumed that a municipally owned plant is a public utility within the meaning of the Utilities Act, and hence is as other public utilities are, subject to supervision, regulation and control of the commission including the fixing of rates and charges, yet it is quite clear that the commission, in fixing the rate to be charged by the city did not regularly pursue its authority and disregarded statutes in such particular. As is seen the commission, in fixing a rate for the city, determined it upon the

same basis or consideration usually considered in fixing a rate for a privately owned utility, and fixed the standard rate charged by the company as the required rate to be charged by the city, and, too, without finding or determining that the standard rate so charged was a fair or reasonable rate to be charged by either the company or the city. The commission, finding that the rate proposed to be charged by the city was not sufficient to meet all expenses of operation, maintenance, interest on bonds and for a sinking fund and other necessary contingencies, held the rate sought to be charged by the city unreasonable and "in violation of law," without finding that a rate less than the standard rate of the company would or would not meet all of such requirements of the city.

The crux of the situation, and, as is apparent on the record, the difficult question presented to the commission grew out of a competitive condition between the company and the city, each furnishing to and supplying inhabitants of the city with electrical energy for the same general purposes. The commission found each was capable of serving all present needs of all consumers of the city with electrical energy, "efficiently and well." There being patronage only for one, each in competition with the other strove to hold what it had and to obtain as much more as it legitimately could. Under such circumstance, fixing a reasonable and just rate for both was no easy task. The primary purpose in fixing rates or charges of public utilities is to protect and safeguard rights and privileges of the public and to secure to it an efficient and an adequate service at reasonable rates, but not to fix rates or charges, or regulate or control the service, so as to deny the utility company reasonable compensation for its service, and certainly not so as to impair its business or deprive it of property or of a legitimate use or enjoyment of it.

Apparently, and as shown by the record, what the commission primarily attempted was an adjustment of disputed

claims and asserted rights of and between the company and the city with the public as a mere bystander or an onlooker. In fixing the rate the commission undertook to put the contestants as near as may be on an equality, and what as a basis or measure of the rate was considered proper for the one was also considered proper for the other, and thus regarded the relation between the two contestants as the important factor rather than the relation of each to the public and to public good and public welfare. Instead of fixing a maximum rate beyond which neither competitor could charge with the privilege of each to render service at a lower rate and thereby give the public the benefit of competition, it fixed a minimum and maximum at the same rate beyond or below which neither contestant was permitted to go.

Let it be assumed that the commission may fix a minimum as well as a maximum rate, still the rate must be fixed primarily with relation of the utility to the public, and not primarily with a competitor, nor with a view that, if the one cannot give efficient and adequate service at a particular rate, neither should the other be permitted to do so, regardless of whether it was or was not for public good to permit it. If taxpayers and citizens of a town or city desire through their municipality to own and operate their own plant for their own use and for the use of the municipality at cost, they ought not to be denied the right or privilege, because a competitive and privately owned utility, operating a plant for gain and profit at the same place, may not be able profitably to furnish the product at a rate or charge lower than its standard rate, or at a rate proposed by the municipality. To say a municipality, its taxpayers and citizens, have the right to own and operate a utility, but may not be permitted to operate it at a rate less than a privately owned utility may supply the product at a reasonably profit, is, in effect, to deny to a municipality whatever advantage or ability it may have, if any, to furnish and supply the product at a rate or charge lower than that of a privately owned utility for gain and profit.

From the very nature of their organization and the purposes for which they are organized, municipalities owning and operating utility plants to supply products thereof for their own use and for the use of their inhabitants at cost, in a sense, constitute a separate and distinct class from that of privately owned utilities organized and operated for gain and profit, and thus when the relation of the utility to the public is considered as of primary importance it does not follow that the rate to be fixed for the one class necessarily requires the same rate for the other, or that a determination of the rate necessitates or requires the same basis or a consideration of the same elements or factors for the one as for the other. Here the city contended that the rate proposed by it would raise sufficient revenue to meet all expenses of operation and maintenance, interest on its bonds, and provide a sinking fund, and further contended that whatever deficits, if any, there might be, were expressly authorized by statute to be met by taxation.

The company, with whom joined its intervening customers, disputed that the city's proposed rate would raise sufficient revenue to meet such requirements of the city, and that deficits would result which would have to be met by taxation which they implored the commission to prevent. The commission, finding with the contention of the company and its intervening customers, and that the proposed rate would not meet the necessary requirements of the city, ruled that to operate the city's plant at its proposed rate and meet deficits by taxation was "in violation of law," notwithstanding the statute expressly and admittedly authorized and permitted that to be done. As heretofore shown the statute, when the Public Utilities Act was adopted, by its mandatory provisions, required the city anually to levy a sufficient tax to pay the interest on its bonds and to provide a sinking fund for the payment of the bonds when they mature, and three years after the adoption of the Utilities Act, the statute with such mandatory provisions was re-enacted, and seven

years after the adoption of the Utilities Act was again re-enacted, but giving the city a discretion or an election to meet such requirements by charges from operation or by taxation.

Now, the effect of the ruling of the commission is that to permit the city to continue to operate its plant it is required to make a charge sufficiently large to meet all such requirements, including expenses of operation and maintenance, without resorting to taxation, and that a rate which did not accomplish such purpose was "in violation of law." In that we think the commission not only erred, but failed to give proper effect to the statute. In fixing a rate for the city, the commission was just as much bound by such statutory provisions as we are, and had no more license to disregard them than we have. Whatever views may be entertained as to the wisdom of municipalities owning and operating their own utility plants, or as to legislative enactments requiring interest and the principal of a bonded indebtedness created to establish and maintain the plant to be met by taxation, or partly by taxation and partly by charges from operation, or whether to permit a city in the operation of its plant to so meet such financial requirements is or is not unjust or unfair to a competitive and privately owned utility operating at the same place, cannot justify a disregard of such statutory requirements, nor a refusal to give them effect, especially since they were re-enacted three years and again seven years after the adoption of the Utilities Act, and as a mandatory declaration of the Legislature notwithstanding that act. We thus think that, instead of the proposed rate of the city being "in violation of law," as declared by the commission, its order as made is itself "in violation of law," and on that, if on no other, ground should be annulled.

We now pass to another phase of the case. Though it be assumed that a municipally owned plant, as here, is a public utility within the meaning of the Utilities Act, and thus sub-

ject to the jurisdiction and control of the commission
to the same extent as a privately owned utility, and
that the order made by the commission is not contrary
to the statutory provisions heretofore considered, yet the
act, so construed and considered, is in violation of and for-
bidden by section 29, article 6, of our Constitution. By that
section it is provided:

"The Legislature shall not delegate to any special commission, pri-
vate corporation or association, any power to make, supervise or inter-
fere with any municipal improvement, money, property or effects,
whether held in trust or otherwise, to levy taxes, to select a capitol
site, or to perform any municipal functions."

It, of course, is urged on behalf of the company that the
Legislature under its police power had the right to dele-
gate, and by the Utilities Act had delegated, power to the
Commission, not only to regulate and control and fix rates
and charges of privately owned utilities, but also of munici-
pally owned utilities as well; that, if there be any statute in
conflict therewith, it must give way to the Utilities Act as
must all contracts made by or with a public utility as to
rates, charges or service, whether made prior or subsequent
to the adoption of the Utilities Act, and that even constitu-
tional provisions in such particulars do not operate as a limi-
tation upon nor interfere with the exercise of such a police
power. While the police power is an attribute of sovereignty
and is inherent in the state, yet it is not without its limita-
tions, for the Legislature under the guise of police power may
not invade mere private rights, or violate rights and privi-
leges guaranteed or safeguarded by the Constitution. In
other words, however broad the police power may be, it
nevertheless is subject to the fundamental principle that the
Legislature may not exercise a power forbidden it by either
the federal or the state Constitution. 12 C. J. 928; 6 R. C. L.
196.

For the same reason may the Legislature not delegate a
power which by constitutional provisions is otherwise vested,

conferred, or forbidden. That in the absence of constitutional restriction the Legislature may in the exercise of its police power fix or determine rates and charges of public utilities doing business within the state, or delegate the power to do so, and within limitations and restrictions regulate and controy their service, is well settled. That is on the theory primarily of protection to the public against unreasonable, unjust, or excessive rates and charges, and for public safety and convenience and public good, and not primarily protection to or for the benefit of public utilities themselves, whose rates and charges are fixed and service regulated and controlled.

In a number of cases this court has held that, because of the police power of the state and of a delegation of it to the Utilities Commission to fix rates and charges of public utilities, no contract made by or with a public utility with respect to rates and charges, whether entered into before or after the adoption of the Utilities Act, is, in such respect, of any binding effect, if in the judgment of the commission the rate or charge so fixed by contract, though fair and reasonable when made, has, by reason of changed conditions or otherwise, become unreasonably low or discriminatory, and that hence the commission may and should disregard such contracts and fix a higher rate or charge, which in the judgment of the commission is reasonable and just and not discriminatory, and that neither the federal nor the state Constitution forbidding the impairment of contracts, operates against the exercise of such a power. *Salt Lake City* v. *Utah L. & Tr. Co.*, 52 Utah 210, 173 P. 556, 8 A. L. R. 715; *Murray City* v. *Utah L. & Tr. Co.*, 56 Utah 437, 191 P. 421; *United States S. R. & M. Co.* v. *Utah Power & L. Co.*, 58 Utah 168, 197 P. 902; *Utah Copper Co.* v. *Public Utilities Comm.*, 59 Utah 191, 203 P. 627; *Utah Hotel Co.* v. *Public Utilities Comm.*, 59 Utah 389, 204 P. 511; *City of St. George* v. *Public Utilities Comm.*, 62 Utah 453, 220 P. 720. In all such cited cases a public utility sought the Utilities Commission for, and was granted, relief from contracts en-

tered into by and with the public utility company with respect to rates and charges, on the ground that the rates and charges contracted for by it were or had become unreasonably low, and was granted a higher rate or charge as fixed by the commission.

While no case has yet come to this court where the Utilities Commission set aside a contract on the ground that the rate or charge as fixed by contract was unreasonably high and where a lower rate or charge was fixed by the commission, still its power in such respect to also fix a lower rate or charge is undoubted. This, however, is the first case coming to this court where the commission undertook to fix or determine the reasonableness of a rate or charge to be made by a municipality of the state owning and operating its own utility, such as a system of waterworks, electrical or other utility plant. The case of City of St. George v. Public Utilities Comm., supra, is cited as a case of such character. But it is not. The case is one where the Dixie Power Company, a public utility, applied to the Utilities Commission, for public good, public safety, and general welfare, to abrogate its contract entered into by it with the city to furnish it electrical energy for lighting and other purposes at a stipulated rate and to have the commission fix a higher rate or charge, which it did. True, in that case this court said that municipal corporations, by express terms, are included within the Utilities Act and subject to the same supervision and control by the commission as are other corporations affected and controlled by it. But that was wholly unnecessary to the decision. The power and jurisdiction of the commission to fix rates and charges for the Dixie Power Company was in no particular dependent upon the proposition or fact of whether it had contracted to serve a municipal or private corporation or company, or an individual or group of individuals. In such respect it was wholly immaterial whether the contract made or service rendered by the Dixie Power Company was made with or rendered to a municipality or

private or other corporation, or a mere individual. The question in such particular was the same in that case as in all of the other cited cases.

We thus have a different situation and question. Let it be conceded that, since the adoption of the Utilities Act, municipalities no longer have power to fix or establish rates or charges to be made by a privately owned public utility company furnishing and supplying the city or its inhabitants with water or electrical energy, etc., or otherwise operating and doing business within the limits of the municipality. That is well settled by our prior decisions. But that does not answer the question now before us of whether the Legislature by the Utilities Act has taken from municipalities the power to fix their own rates and charges in operating and in controlling their own plants or systems of waterworks or electrical or other utilities for their own use and for the use of their inhabitants and conferred the power on the Utilities Commission, and, if so, whether it was competent for the Legislature so to do.

Because patrons, customers or consumers of a product of a privately owned public utility, as a rule have no voice in the handling and management of the business, nor in fixing and establishing rates and charges, and no adequate remedy or redress against unreasonable or excessive or unjust rates or charges fixed by a public utility company, there are good legal reasons for the state, under its police power for public good and protection, to fix a reasonable and just rate or charge for such a utility, or to delegate the power so to do to a commission or board of its creation. But no such ground exists to so safeguard and protect taxpayers and citizens of a town or city owning and operating its own utility for its own use and for the use and benefit of its inhabitants, for the consumers of the product and the citizens and taxpayers of the town or city have a voice in the management and handling of the plant and as to the rate or charge to be fixed. The plant is their own plant. It is

their property. It is for them, through their chosen officers and boards, to determine, not only the character of the plant to be owned and operated, but also the rates and charges to be made and whether the interest on and principal of bonds shall be met by taxation or by charges from operation or partly from the one and partly from the other. If officers, boards, or agents chosen and selected by them do not comply with their demands or requests, or fix an unfair or an unreasonably low or high or a discriminatory rate or charge, others can be chosen or selected to establish a proper and fair rate or charge or consumers may appeal to the courts to correct any such abuses. To take such power from taxpayers and citizens of a town or city and confer it elsewhere is, as we think, an unauthorized interference with the performance of mere corporate and municipal affairs forbidden by the Constitution.

If a municipally owned plant is included within the Utilities Act as a public utility, then, by the provisions of the act, whenever ordered by the commission, a municipality, before entering into a contract for construction work, or for the purchase of any facilities, or with respect to other expenditures, is required to submit its proposed contract, purchase, or other expenditures, to the commission for its approval, and if disapproved by it, it may order other contracts, purchases, or expenditures in lieu thereof for all legitimate purposes and economical welfare of the utility, which, as it seems to us, constitutes a direct supervision over and an interference with the municipal improvements and property and the performance of municipal functions and affairs forbidden by the Constitution. So, too, if power is delegated to the commission to fix rates and charges to be charged by the municipality, and if it may do what it here did, disapprove a rate which would not raise sufficient revenue for all purposes in connection with the plant without resorting to taxation, the commission in effect may determine when a municipality may and when it may not meet any

part of such expenses by taxation and thereby indirectly supervise, direct, and interfere with the levying of taxes for such purpose by the municipality, and by fixing rates and charges make the operation of the plant dependent upon it. We think the exercise of such a power is by the constitutional provision forbidden.

We think it clear that the undoubted purpose of the constitutional provision is to hold inviolate the right of local self-government of cities and towns with respect to municipal improvements, money, property, effects, the levying of taxes, and the performance of municipal functions. Stress, however, is laid on the words in the section of the Constitution, "special commission," that the power shall not be delegated to a special commission, and that the Public Utilities Commission is a general and not a special commission, and hence whatever power may have been delegated to the commission in such respect is not in violation of such constitutional provision, to support which the case of *Public Service Commission* v. *City of Helena*, 52 Mont. 527, 159 P. 24, is especially cited. That case so holds. But we think such a construction of the section is too narrow, and one which in effect impairs the very essence and purpose of it, deprives cities and towns of local self-government, and interferes with their power to levy taxes and in the performance of their municipal corporate affairs with respect to their improvements, property and municipal functions. *Town of Holyoke* v. *Smith*, 75 Colo. 286, 226 P. 159.

Besides the Montana case, we have not been referred to any decision where, under a constitutional provision similar to ours, it was held that it was competent for the Legislature to delegate power to a Utilities Commission to supervise, regulate and control a municipally owned plant or to fix rates and charges for its operation. The cited Colorado case, under an identical constitutional provision as Montana and our state, is in direct conflict with and repudiates the Montana decision. It holds that the prohibition in the Con-

stitution is not limited by the fact that the term "special commission" is used, for, if there is reason to prohibit a special commission, a private corporation or association from exercising the powers named, it extends as well to a general commission; and if municipalities are entitled to protection from an agency of the state exercising delegated powers of the kind enumerated, the right thus proposed to be protected would be violated as much by a general commission doing the mentioned acts as by a special commission doing the same things, and that the essence and purpose of the constitutional provision is to forbid a delegation of the enumerated powers. We believe the Colorado case is supported by the better reason and is better founded on fundamental principles. We thus approve it.

The case of *Borough of Lansdowne et al.* v. *Public Service Commission,* 74 Pa. Super. Ct. 203, also is cited as an authority to the same effect as that of Montana. We do not so regard that decision. The constitutional provision of Pennsylvania is identical with ours and with that of Montana and Colorado. However, under the Pennsylvania Utilities Act, a municipality or borough owning and operating its own utility is not a public utility and is expressly excluded therefrom. Hence the decision in no particular involved the right or power of the commission to regulate or control or fix rates or charges of a municipally owned plant. There the borough had entered into a contract with the Springfield Consolidated Water Company, a privately owned public utility, to supply and furnish water to the borough for fire protection, as had other water consumers entered into similar contracts with the company, with privileges of renewal. Upon the expiration of the time stipulated in the contracts the company refused longer to furnish water at such stipulated rate, and declined renewals of the contracts at such rates and increased its rate of service. Thereupon the borough and other consumers applied to the commission to require the company to furnish water at the contract rate, and,

among other things, contended that the company could not nor could the commission permit the company to abrogate its contracts. The commission held against the applicants and on evidence heard and findings made held the increased rates were justified and reasonable and thus dismissed the petition.

On appeal to the Superior Court by the borough and the consumers, the decision was affirmed. The borough urged that, among other constitutional provisions, the provision in question forbade the abrogation of the contract, and that to permit the company to do so constituted an interference with the right of the borough to contract with the water company to supply and furnish water for its municipal needs. The court in such respect held, as did this court, in the cases of *St. George* v. *Public Utilities Commission, Salt Lake City* v. *Utah L. & Tr. Co.*, and *Murray City* v. *Utah L. & Tr. Co.*, that in fixing rates for a public utility company the constitutional provision in question did not forbid the commission to disregard contracts entered into by and between the public utility and consumers and fix a higher rate, if on the evidence and in the judgment of the commission it found that the contract rate was unreasonable or discriminatory, and that in such respect it mattered not whether the consumer was a private person, or a private or public corporation, or the contract entered into was with the one or the other or with a municipality. In that connection the court said that the power exercised by the commission was the fixing of a just and reasonable rate for a privately owned public utility, which it had the undoubted authority to do, and that exercising such a power did not constitute an interference with any of the prohibited powers enumerated in the constitution; that the commission was not a special commission, and had no power or authority to usurp, and that it had not usurped, any municipal power or function forbidden by the constitutional provision in question.

Such holding is now pointed to as an authority that the commission here is not a special commission, and that the power to supervise, regulate and control the business of a municipally owned and operated plant and fix rates and charges with respect thereto is no more an interference with the forbidden and enumerated powers in the Constitution than fixing and determining rates and charges of a mere privately owned public utility. We think the decision does not support such a holding, and that the view contended for in such respect is unsound, and not a proper construction of the Constitution. To say that the power of the commission, not withstanding the Constitution, to supervise, regulate, and control the business and fix rates and charges of a municipally owned and operated plant is the same as that of a privately owned public utility, is to disregard or not give effect to the Constitution, for a municipality is specifically and exclusively mentioned therein, and the Constitution in such particular expressly and exclusively adopted for the benefit and protection of only municipalities.

Analogous to this is the right and power of the commission to supervise, direct, and control the business of waterworks, water rights, and water sources of a municipality owned and controlled by it, and to fix rates and charges of such utilities. It is conceded, and it was argued, that if the commission has power to supervise, regulate, and control the business of a municipally owned and operated electrical plant and fix rates and charges for its operation, it may also exercise the same power with respect to waterworks and water rights owned and operated by a municipality supplying water to its inhabitants and for its own use. In some instances such a power has been exercised by the commission, notwithstanding the further constitutional provision (section 6, art. 11) that no municipal corporation shall directly or indirectly lease, sell, alienate, or dispose of any waterworks, water rights, or sources of water supply owned or thereafter to be owned or controlled by it, and that all

such waterworks, water rights, and sources of water supply owned or thereafter to be acquired by any municipal corporation are required to be preserved, maintained, and operated by it for supplying its inhabitants with water at reasonable charges. Thus, apart from the prohibition forbidding the sale and alienation or other disposal of waterworks, water rights, or sources of water supply of a municipality, such constitutional provision is indicative of the same policy and inhibitions expressed in section 29, art. 6.

It is hard to believe that by the Utilities Act it was intended that a municipality owning and operating its own waterworks or system, before entering into a contract with respect to its construction or the enlargement of it, or in the purchase of facilities, or incurring expenditures, is required to submit to the commission its proposed contract, purchase, or expenditure, and, if disapproved by it, to order and direct a contract or expenditure in lieu thereof. And still more difficult is it to understand that, if such a power by the Utilities Act is so delegated to the commission, why the act in such particular is not in direct conflict with the Constitution. The same reason and observation, as we think, equally apply to an electrical plant owned and operated by a municipality for its own use and for the use of its inhabitants.

There is still a further constitutional provision (section 4, art. 14) of some relevancy to the matter in hand, which places a limit of indebtedness of cities and counties not exceeding 4 per centum of the value of the taxable property therein, with a proviso, however, that any city or town may incur a larger indebtedness, not exceeding 4 per centum additional, "for supplying such city or town with water, artificial lights or sewers, when the works for supplying such water, light and sewers, *shall be owned and controlled by the municipality.*" (Italics added.) Such, as we think, contemplates that such utilities as there enumerated shall not only be owned, but also controlled, by the municipality, and

is indicative of a policy in harmony with the other constitutional provisions referred to, to hold inviolate the right and power of a municipality so to do, and that to delegate a power to a commission or other agency to supervise, regulate, and control the business of such a municipally owned utility, disapprove contracts, purchases, and expenditures of the municipality with respect thereto, and substitute others in lieu thereof, fix rates and charges under which the utility may be operated, and to permit the commission to do what it here in effect did, determine the means or source by or from which the operating expenses and bonded indebtedness of the plant or works must be met, constitute unauthorized interferences with the control of the utility by the municipality.

We thus are of the opinion that the order made by the commission, in so far as it affects Logan City, is beyond the power and jurisdiction of the commission, and therefore is annulled and vacated. Inasmuch as the complaint made of the order and the relief sought with respect to it involve only the rate or charge fixed by the commission in so far as it affects the city, and the annulment of contracts entered into between it and its customers, the review and judgment of this court necessarily is restricted to such matters. As to these, the order is annulled. In other particulars it is not disturbed. Costs are awarded to to the city against the Utah Power & Light Company and its intervening customers.

HANSEN, J., concurs.


GIDEON, J. (concurring in part.) As I interpret the language of the Public Utilities Act, it is clear that the Legislature intended to, and did, declare that the Public Utilities Commission be given jurisdiction over all public utilities, including those owned and operated by municipalities. Any other construction makes certain provisions of the law

meaningless and without place or relationship to the subject matter of the legislation.

In chapter 2 of the act (Comp. Laws 1917, tit. 91) it is provided that "the term 'corporation,' when used in this title, includes a corporation, an association, a municipal corporation. * * " It is therein further provided that "the term 'municipal corporation,' when used in this title, shall include all cities, counties, or towns, or other governmental units created or organized under any general or special law of this state." If it were not the intent of the Legislature to make municipalities owning and operating municipally owned utilities subject to the provisions of the act, then defining what shall be included in the term "municipal corporations" would seem to be foreign to any purpose of the enactment.

In my judgment that intent of the Legislature, as expressed by the language of the act, is not overcome or defeated by other provisions of the act requiring the utility to deliver copies of its contracts, franchises, books, etc., necessary to enable the commission to determine a reasonable rate to be charged for services rendered by such utility. Nor do I think that either the statute in force at the time of the Public Utilities Act or subsequent legislation authorizing municipalities to levy taxes for the payment of interest on bonds or for the redemption of bonds is inconsistent with or contradictory of the expressed intent of the Legislature giving to the commission jurisdiction over municipally owned utilities.

Incorporated cities in the territory of Utah were, by Comp. Laws Utah 1888, § 14, art. 4, p. 622, authorized "to construct and maintain waterworks, gas works, electric light works, street railways," etc. It will thus be seen that, at the time of the adoption of our state Constitution, owning and operating an electric light plant was a recognized right enjoyed by the municipalities of the territory of Utah; that is to say, municipalities in the then territory were author-

ized to construct and maintain electric light works as a part of the powers and duties granted by the Legislature of the territory. It is also a matter of history that municipalities of the territory did own and operate waterworks and other municipally owned utilities at the time of and prior to the adoption of the state Constitution, and likewise that the question of municipal ownership had been considered and discussed by the people of the territory prior to the adoption of the Constitution.

Section 29 of article 6 of our state Constitution reads:

"The Legislature shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

What was intended by the adoption of this section? To determine the intent of the Constitution makers the language used by them must be and should be read in the light of the conditions in the territory of Utah at the time of the adoption of the Constitution, as well as in the light of the history of the people and their institutions at and prior to that time. Local self-government, or what is generally designated as "home rule," is not an innovation in this country. It is nothing new for municipalities, in Utah or elsewhere in the United States, to enjoy home rule or local self-government. The fact and the right of local self-government existed and was exercised from the earliest settlement of the various territories. The right was enjoyed long prior to the adoption of state Constitutions and the admission of the territories into the Union as independent states.

Section 29 of article 6 of the Utah Constitution did not grant to municipalities the power to exercise the right of local self-government, or to own and control property, or to own and operate a public utility for the benefit of the

inhabitants of such municipalities. These benefits the municipalities already enjoyed. On the contrary, the section is a limitation of the power of the Legislature to delegate to any body, save only the regularly elected officers of the municipalities, the right to supervise or interfere with the property of the municipalities, or to perform any municipal functions. The purpose of the constitutional provision quoted was to guarantee to the municipalities local self-government, and to deny to the Legislature any power to delegate to any body other than the local government the right of supervision over or interference with the property of the various municipalities within the state.

Let it be conceded that, in the absence of constitutional inhibition, the Legislature could take the government of the cities from the people residing therein and create new forms of government under the immediate control of the Legislature. That is one thing. The delegation of the right to a commission, not the choice of the inhabitants, is quite another thing. The denial of the latter is what the above-quoted provision of the Constitution, as I interpret it in the light of history, means. And in my judgment it means all of that.

It is very clearly pointed out by the Colorado court in *Town of Holyoke* v. *Smith*, 75 Colo. 286, 226 P. 158, that the purpose of the constitutional provision ought not be, and cannot be, defeated by designating the commission to which the power is attempted to be granted a general rather than a special commission.

I concur in the judgment holding that the Public Utilities Commission is without jurisdiction to fix and determine the rate or price to be charged by Logan City for electrical energy furnished by it.

WOOLLEY, District Judge. I concur in the result announced in the opinion written by Mr. Justice STRAUP; but, since I am not in agreement with him upon all the points

discussed I think it advisable to set out briefly my position with respect to them.

In the first part of the opinion, after the statement of the facts and the contentions of the various parties, is a discussion of the question of whether or not the Legislature, by the Public Utilities Act, intended to include utilities owned by municipal corporations among those over which the commission is given the power of control and jurisdiction for rate-making purposes, and the conclusion is reached that such was not the intention of the Legislature. With this conclusion, and with several of the minor statements and propositions made in support of it, I do not agree. It seems clear to me, from a reading of the Public Utilities Act, in connection with the statutes existing at the time of its enactment, relating to the powers of municipal corporations over public utilities, that the Legislature of 1917 intended to and did, constitutional objections aside, place municipal corporations owning electric light and power plants and other utilities within the jurisdiction of the commission to the same extent that private corporations and individuals are placed within that jurisdiction. As this court says in the St. George Case, "they are there treated precisely the same as all other corporations or persons that are affected or controlled by the act."

While it is true, as Mr. Justice STRAUP says, that this is a conclusion deducible from a consideration of the definitions contained in the act, yet I think it is the only sound conclusion that can be reached, if any meaning whatever is to be given to those terms of the act relating to municipal corporations. The case, therefore, in my estimation, is not one in which can be applied the rule of construction that if two meanings or constructions can fairly be given to an act, one rendering it in harmony and the other in conflict with the Constitution, the former should be adopted; for in my judgment the act is not fairly open to a construction in harmony with the Constitution. I think that if the act is con-

stitutional, then the commission has the power to fix the rates and control the business of public utilities owned by municipal corporation to the same extent that it has that power over other utilities, except as its jurisdiction with respect to rate making may be found to be modified by the amendments made in 1925 to section 794.

Furthermore, the jurisdiction vested in the commission by the Public Utilities Act is not alienated, although it may be, and I think it is, by necessary implication, limited as regards rate making by section 794, as it stands after the amendments made in 1925. If due regard be given to section 794, as amended, then in making rates for municipal plants the commission is not bound by the same rules that it must apply in making rates for privately owned utilities; since in the former case, under the statute, the rates may or may not be made sufficient to cover bond interest and sinking fund requirements, as well as operating and maintenance expenses, and still be legal—that is, reasonable. But, except to this extent, I see see no irreconcilable conflict between the Public Utilities Act and the amended section 794. The conflict is more apparent than real. The amending act contains no express repeal of the Utilities Act. Nor does it expressly delegate to municipalities jurisdiction to fix rates. The power given to the city council is to levy taxes for deficiency, not to fix rates. The Utilities Act and section 794 relate to different matters. So in my judgment there is certainly no intention manifested by the Legislature, when it amended section 794, to repeal the Utilities Act in any particular, most assuredly not to the extent of taking municipal corporations entirely out of the jurisdiction of the commission; nor is there any irreconcilable conflict between the two, except to the extent above indicated.

With Mr. Justice STRAUP'S reasoning and conclusions upon the point that the commission did not regularly pursue its authority, assuming that it had jurisdiction, in fixing the rates for Logan City plant, because it ignored the law

contained in section 794, as amended, I am in full accord. But I am in doubt as to the necessity of discussing this point, although it is one of the main points of contention in the case, because of the conclusions which I have reached regarding the validity of the Public Utilities Act in so far as it relates to municipal corporations.

That the people of Utah, when they adopted section 29 of article 6 of the state Constitution, intended to limit the power of the legislative branch of government, so as to prevent the delegation of the power to perform municipal functions, or the power to supervise or interfere with municipal property, to any commission outside the municipal fold, and that they thereby manifest an intention, which must be respected by the courts, that municipal property shall remain under the supervision and control of, and municipal functions shall be performed by, municipal officials, who are amenable to the will of the inhabitants of the municipalities, so long as municipal corporations continue to exist and that section remains a part of the fundamental law, are propositions about the soundness of which I have no doubt.

To the extent that the Legislature, in the Public Utilities Act, has delegated to the commission the power to supervise and control municipal corporations with respect to utilities owned by them, or to fix the rates to be charged by them, thus giving to the commission the power to interfere with and control municipal property and to perform municipal functions, has it transgressed the limits of its powers as defined by the Constitution. The Public Utilities Act, in this respect being in conflict with the constitutional provision above mentioned, in my opinion is void, and hence the commission had no power or jurisdiction to make the order setting aside the contracts between Logan City and its customers and fixing the rates to be charged by the Logan City plant. The reasons and arguments supporting the foregoing conclusions upon this branch of the case being set out by Mr. Justice STRAUP and also by Mr. Justice GIDEON in

his concurring opinion, it would be mere repetition for me to write them down again.

I content myself, therefore, by stating that I concur with what they have said upon this subject.

CHERRY, J., dissents.

THURMAN, C. J., being disqualified, did not participate herein.