**MUNICIPAL BUILDING AUTHORITY OF IRON COUNTY, Utah, a Utah nonprofit corporation, and Iron County, a body corporate and politic, Plaintiffs and Respondents,**

v.

**Dennis LOWDER, individually and as county auditor of Iron County; and Clair Hulet, individually and as county clerk of Iron County, Defendants and Appellants.**

No. 19959.

Supreme Court of Utah.

Nov. 27, 1985.

---

D. Williams Ronnow, Cedar City, for defendants and appellants.

Scott J. Thorley, Jr., Cedar City, Phillip H. Holm, James E. Spiotto, Darrell R. Larsen, Salt Lake City, for plaintiffs and respondents.

ZIMMERMAN, Justice:

Defendants, the auditor, treasurer and clerk of Iron County, appeal from a district court decision upholding the Utah Municipal Building Authority Act ("the Act") against a variety of constitutional challenges and finding that the actions proposed by the Iron County Board of Commissioners and the Iron County Municipal Building Authority ("the Authority") to finance construction of a new jail facility under that Act are lawful. The district court also rejected a challenge to the actions of the county under the Utah Open and Public Meetings Act. We affirm the district court in all but one respect: we find unlawful the proposal that the county transfer a fee interest in the present jail facility to the Authority without adequate consideration.

This case highlights an issue of growing national importance—the difficulty of providing adequate facilities to handle those for whom society demands confinement. All citizens want the laws rigorously enforced and many would like more severe punishments imposed, but few are willing to pay the inevitable costs. These logically inconsistent positions tax to the utmost the financial creativity of responsible public officials.

Testimony before the district court indicated that the fifty-year-old Iron County jail has not met even minimum state and federal standards of habitability for some time. The physical deterioration of the facility and its outdated design, combined with continual overcrowding, have made it unsanitary and unsafe for inmates and jailers alike. Inmates have often had to be released in order to make room for those convicted of more serious crimes. A judge testifying before the district court referred to the jail as "medieval." At taxpayers' expense, Iron County has been forced to defend numerous lawsuits arising out of these appalling conditions.

Lengthy studies have underscored the need to build an entirely new jail. To finance its construction, the Iron County Commissioners proposed issuing general obligation bonds. Article XIV, section 3 of the Utah Constitution requires that such bonds be approved by the voters because they would be a long-term debt of the county. In December of 1981, a bond election was held and the proposal was defeated, leaving the county in a difficult dilemma. As a practical matter, the new facility had to be built; yet the Iron County taxpayers were unwilling to pay for the facility through the traditional means of financing major capital improvements—general obligation bonds.

The Board of Commissioners devised a plan which would permit a jail to be built without prior voter approval. Article XIV, section 3 requires voter approval of long-term indebtedness only when the indebted entity is a county or a subdivision of a county.[1] *See Lehi City v. Meiling,* 87 Utah 237, 256–57, 48 P.2d 530, 539–40 (1935).

---

**1.** Article XIV, section 3 reads as follows:

No debt in excess of the taxes for the current year shall be created by any county or subdivision thereof, or by any school district therein, or by any city, town or village, or any subdivision thereof in this State; unless the proposition to create such debt, shall have been submitted to a vote of such qualified electors as shall have paid a property tax therein, in the year preceding such election, and a majority of those voting thereon shall have voted in favor of incurring such debt.

The commissioners, acting under the Utah Municipal Building Authority Act, U.C.A., 1953, §§ 11–29–1 to –18 (Supp.1985), created the Iron County Building Authority, a quasi-municipal governmental entity designed *not* to be a "subdivision" of the county and, therefore, to be free from the voter-approval requirement of article XIV, section 3. As required by the Act, the Authority's board of trustees consists of all of the Iron County commissioners. The Authority is empowered to finance and construct a new jail facility and lease it to the county. Because the Authority, not the county, will borrow money for the construction, voter approval of its bond issue will not be necessary, yet a new jail will be made available to the county.

To implement the plan, the county and the Authority propose to enter into several related agreements. For a nominal consideration, the existing jail facility will be transferred to the Authority in fee; in effect, the present jail will be donated to the Authority. That property, now appraised at $124,000, will be traded by the Authority to a private developer for another site upon which the new jail facility will be constructed. Should there be some legal obstacle to this transfer in fee, the county proposes to lease a project site to the Authority. In either event, once the Authority has secured a site, it will issue revenue bonds with a term of twenty years to finance construction, pledging as security its interest in the project site and the facility to be constructed. As part of the same transaction, the county will lease the new jail facility from the Authority for twenty years, on a year-to-year basis. After the twenty years have passed and the bonds are paid in full, the Authority will transfer title to the new facility to the county. The agreements between the county and the Authority provide that in the event the Authority defaults on the bonds before they are paid off, the bond holders may foreclose upon the new jail facility and whatever interest the Authority has in the site, but they will have no recourse against the county or its taxpayers.

On May 10, 1982, the county commissioners authorized the payment of certain project start-up costs. The three defendants—the Iron County auditor, treasurer, and clerk—refused to perform various ministerial duties necessary to finalize the agreements between the county and the Authority and to disburse the authorized funds. They asserted that the Utah Municipal Building Authority Act and the actions the county and the Authority proposed to take pursuant to it were unconstitutional. The county and the Authority immediately filed this action, asking for declaratory relief and seeking a writ of mandamus to compel defendants to carry out their duties.

Before the district court, defendants raised several challenges to the Act and the proposed transaction under the Utah Constitution. These can be summarized as follows: that the financing plan evaded the debt limitations contained in article XIV, sections 3 and 4; that the transaction would result in a loan of the county's credit to the Authority in violation of article VI, section 29; and that the Authority is a special commission prohibited by article VI, section 28. Defendants also raised statutory challenges to the transaction, contending that the transfer of the old jail for inadequate consideration violated sections 17–5–48 and 17–4–3 of the Code, U.C.A., 1953, §§ 17–5–48, 17–4–3 (Supp.1985), and that the county did not give proper public notice of its meetings pursuant to the Utah Open and Public Meetings Act. U.C.A., 1953, §§ 52–4–1 to –9 (1981 ed.).

After an evidentiary hearing, the district court declared the Act constitutional and held that the proposed transaction was permissible. The court authorized a writ of mandamus, although none issued. This appeal followed. Defendants raise, *inter alia*, the issues presented to the trial court. Because this Court has never before considered a transaction authorized by the Utah Municipal Building Authority Act, extended discussion of the issues is warranted.

We first address defendants' contention that the Act allows counties to evade the constitution's debt limitations. Some background is necessary. Article XIV, section 3 of the Utah Constitution prohibits, *inter alia*, any county from incurring debt in excess of the current year's tax revenues without prior approval of a majority of the property taxpayers.[2] A companion provision, article XIV, section 4, limits the debt a county can incur even with taxpayer approval to two percent of the assessed valuation. These two provisions demonstrate the drafters' concern in 1895 that absent limits on total debt and a requirement that any debt to be paid from future revenues be approved by taxpayers, local governmental units might be fiscally irresponsible. Members of the constitutional convention expressed strong concern about the tendency of local governments to provide present benefits to voters and to pay for them from future revenues. *See* Note, *Constitutional Restrictions Upon Municipal Indebtedness*, 1966 Utah L.Rev. 462, 463–64. Sections 3 and 4 of article XIV were a direct response to that concern. *Id.* at 465.

Historically, local governments, often aided and abetted by the state legislature, have tried to find ways to provide facilities needed by an increasingly urbanized society without being hobbled by the strict limitations in sections 3 and 4 of article XIV. This Court has often been receptive to such efforts. For example, the court-created "special fund doctrine" excludes certain bonds from section 3's election requirement if those bonds are repaid from revenues generated by the facilities constructed with the bond proceeds, rather than from general tax revenues. The underlying theory is that the bond holders have no recourse to the general tax revenues and, therefore,

the bonds are not "debt" of the governmental entity in question. *See, e.g., Utah Power & Light Co. v. Ogden City*, 95 Utah 161, 170–71, 79 P.2d 61, 65 (1938).

Another means of avoiding the debt limitations is the creation of a special district. This Court has held that such a district is exempt from the limitations of sections 3 and 4 of article XIV because it is a quasi-municipal entity rather than a "city, county, town or subdivision thereof." *E.g., Lehi City v. Meiling*, 87 Utah 237, 256–57, 48 P.2d 530, 539–40 (1935). Despite some attempts by this Court to limit the use of such districts on varying grounds, *e.g., Carter v. Beaver County Service Area No. One*, 16 Utah 2d 280, 399 P.2d 440 (1965); *Backman v. Salt Lake County*, 13 Utah 2d 412, 419–20, 375 P.2d 756, 760–61 (1962), they have continued to proliferate. Note, 1966 Utah L.Rev. 478–83, 486–87. In fact, article XIV was amended in 1975 to clarify the status of such districts and to provide for legislative control over them.[3]

■ There is no question that the Utah Municipal Building Authority Act is yet another attempt to develop a means for financing needed capital improvements without being restricted by the rigid debt ceiling of article XIV, section 4 or by the taxpayer approval requirement of section 3. Defendants contend that the Act must be struck down as inconsistent with article XIV, sections 3 and 4. We find these arguments without merit.

Defendants contend that the Authority's debt is debt of the county, within the meaning of article XIV, section 3. This Court has rejected similar arguments in the past, and we see no reason to depart from those precedents. The express terms of sections 3 and 4 of article XIV apply only to specified entities, including counties and their

---

**2.** The full text of article XIV, section 3 is set out in footnote 1, *supra.*

**3.** In 1974, the legislature proposed a constitutional amendment to ameliorate some of the difficulties caused by the proliferation of special districts. The amendment, article XIV, section 8, was approved in 1975 by the voters. It brings the formation of special service districts under

the control of the legislature, permits the legislature to exempt them from the limitations of article XIV, sections 3 and 4, and permits the imposition by statute of a ceiling on the amount of outstanding bonded indebtedness. The amendment requires that any bonds issued and repayable from property taxes must be approved by the district's voters.

subdivisions; they do not apply to quasi-municipal entities such as building authorities. Therefore, a debt of the Authority for which the county is not responsible is not subject to the restrictions of article XIV, sections 3 and 4. *See Patterick v. Carbon Water Conservancy District*, 106 Utah 55, 73, 145 P.2d 503, 511–12 (1944), *overruled on other grounds*, 690 P.2d 562 (1984); *Tribe v. Salt Lake City Corp.*, Utah, 540 P.2d 499, 503 (1975).

Defendants next argue that even if the Authority is not technically a subdivision of the county, as that term is used in article XIV, section 3, its debts must nevertheless be considered debts of the county because the Authority is the county's alter ego. This argument also fails. For one corporate entity to be the alter ego of another, two requirements must be met. First, "there must be such unity of interest and ownership that the separate personalities of the corporation[s] ... no longer exist." *Norman v. Murray First Thrift & Loan Co.*, Utah, 596 P.2d 1028, 1030 (1979). Second, "the observance of the corporate form [must] sanction a fraud, promote injustice, or [cause] an inequitable result [to] follow." *Id.; accord Dockstader v. Walker*, 29 Utah 2d 370, 372–73, 510 P.2d 526, 528 (1973); *Gude v. City of Lakewood, Colo.*, 636 P.2d 691, 697–98 (1981). The first of these requirements obviously is satisfied here: the interest of the county and the Authority are identical; under the Act, a building authority must work at the behest of the creating governmental unit, U.C.A., 1953, § 11–29–3(1) (Supp.1985); and the county commissioners qua commissioners are the trustees of the Authority. *Id.*

The second requirement for application of the alter ego doctrine, however, is not satisfied: defendants have not shown that respecting the separate corporate entities will promote fraud or injustice or cause inequitable results. Certainly, no fraud, injustice or inequity is worked on prospective bond holders. The nature of the financing plan is clearly disclosed to the bond holders, who are fully informed that their only security lies in the mortgage of the jail facility. *See Gude v. City of Lakewood*, 636 P.2d at 697–98. When the bond holders purchase, they cannot legitimately do so on the expectation that they will be able to look to the county or its taxpayers for repayment in the event the lease is cancelled.

Defendants assert that the proposed plan of action works a fraud upon the taxpayers because they expressly disapproved construction of a new jail. This mischaracterizes the election. The voters only expressed an unwillingness to incur a general obligation debt to finance the jail's construction; they were not asked whether the facility should be built if general obligation bonding could be avoided. The difference is significant. *See Gude v. City of Lakewood*, 693 P.2d at 697. Under the constitution, it is only the former proposal that must be put before the voters.

Defendants next argue that there is no real difference between the proposed method of financing and general obligation bonding. This is not true. General obligation bonds would irretrievably obligate future taxpayers to pay off the debt incurred to build the jail; financing construction through the Authority will not. Under the proposed arrangement, the county will lease the jail facility on a year-to-year basis. The county retains the option of terminating the lease at the end of each year. Should this occur, neither the Authority nor the bond holders will have any recourse against the county or the taxpayers for the amount remaining unpaid on the bonded indebtedness.

In addition to the practical differences between a long-term bond indebtedness and a year-to-year obligation, there is a constitutionally significant legal difference: under article XIV, section 3, a contractual obligation that can be discharged within one year is not considered a debt that must be submitted to the voters. *See Muir v. Murray City*, 55 Utah 368, 186 P. 433 (1919). Our cases have held that the aggregate amount that may ultimately be paid under a multi-year contract or lease need not be taken into account in determin-

ing whether the debt represented by the contract or lease exceeds the current year's revenues so long as the actual amount due under the contract accrues only as the services are provided and the municipality cannot be coerced into paying for services not yet rendered. *See Barnes v. Lehi City*, 74 Utah 321, 343, 279 P. 878, 886 (1929); *Barlow v. Clearfield City Corp.*, 1 Utah 2d 419, 425–28, 268 P.2d 682, 686–88 (1954); *Bair v. Layton City*, 6 Utah 2d 138, 145–47, 307 P.2d 895, 901–02 (1957); *accord Book v. State Office Building Commission*, 238 Ind. 120, 141–42, 149 N.E.2d 273, 287 (1958); *City of Phoenix v. Phoenix Civic Auditorium & Convention Center Association, Inc.*, 99 Ariz. 270, 286–93, 408 P.2d 818, 829–34 (1965).

In the present case, the county has the right to terminate the contract at the end of any year. The amount due in any one year is only for services provided during that year. Therefore, the proposed lease qualifies for treatment on a year-to-year basis under *Barnes v. Lehi City* and related cases. Of course, as a practical matter the county will renew the lease for the next twenty years. But that does not affect the analysis so long as the county cannot be held legally responsible for other than the services it receives during the current tax year.

We conclude that the proposed arrangement between the county and the Authority does not work a fraud, injustice or inequity upon the bond holders or the taxpayers. Therefore, the alter ego doctrine has no application here.[4]

■ Defendants next argue that even if the alter ego doctrine is not applicable, the Authority's debts must be deemed to be the county's debts because the Authority is an agent for the county. However, describing the Authority as an agent of the county does not carry the day for defendants. An agent cannot make its principal responsible for the agent's debts unless the agent is acting pursuant to either actual or apparent authority. *See* Restatement (Second) Agency §§ 26, 27 (1958). The latter is implied where the principal has permitted the agent to mislead third parties into extending credit to the agent in reliance on the principal's credit or has otherwise ratified the agent's actions. *Id.* at § 27. We find neither condition required for an agency relationship to be present in this case. There is no suggestion that the Authority is actually authorized to bind the county on the bonds, nor is there any basis for finding that third parties will be misled as to the county's liability on the bonds. In fact, it is unlikely one could be so misled, for one who contracts with a municipal corporation is charged not only with notice of the limitations upon the municipality's authority, but also of the power of the particular agency to enter into the contract. McQuillan, *The Law of Municipal Corporations* § 29.04 (3d ed. 1981). Defendants' agency argument lacks any merit.

■ The next contention advanced by defendants in an attempt to bring the transaction before us within the prohibitions of article XIV, sections 3 and 4 is that the Act has an impermissible purpose—it allows municipalities to evade constitutional debt limits and create debt indirectly where it cannot be created directly. Defendants' argument belabors the obvious. Of course the Act is intended to permit avoidance of

---

4. Defendants rely upon *O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 303 P.2d 672 (1956), for the proposition that fraud is not an essential element of the alter ego doctrine. However, that case was decided under language peculiar to the Idaho Constitution and relied on Dillon's Rule to strictly construe the authority of Idaho municipalities. Dillon's Rule has been restricted in Utah. *State v. Hutchinson*, Utah, 624 P.2d 1116, 1118–26 (1980). Furthermore, Idaho has since changed its position with regard to the status of independent agencies, holding that the alter ego doctrine does not apply where the municipality has no authority or control over the agency. *See Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 881–82, 499 P.2d 575, 579–81 (1976).

*Laramie Citizens for Good Government v. City of Laramie*, Wyo., 617 P.2d 474 (1980), another case relied upon by defendants, is also not on point. In that case, the city had an unconditional obligation to lease the facility in question for fifteen years. The court did not reach the alter ego issue.

the constitutional debt limitations. It is the very rigidity of those limitations that has led the courts to narrowly construe them and the legislature to actively assist local government in avoiding them. *See generally Tribe v. Salt Lake City Corp.*, Utah, 540 P.2d 499 (1975); *cf. State v. Hutchinson*, Utah, 624 P.2d 1116, 1118–26 (1980) (restricting Dillon's Rule requiring strict construction of municipal powers). We reject defendants' argument. If the express terms of an enactment do not offend the constitution, its purpose alone will not render it unconstitutional. And nothing prohibits local governments from lawfully avoiding these constitutional limitations.

Defendants' final argument under article XIV, sections 3 and 4 is that the use of general tax revenues to make the yearly rental payments under the jail lease will have the same economic result as if general obligation bonds had been issued; therefore, the jail lease payments should be considered debt subject to the constitution's restrictions. They reason that the use of general tax revenues to make the annual rental payments will result in a reduction of funds otherwise available to the county and will require the county to raise taxes to compensate for the expenditure on the jail. The net result is that the taxpayers will pay higher taxes just as if they had approved the original bond proposal. Defendants' assumptions may be correct, but their conclusion—that transactions resulting in the same economic burdens must be treated similarly for purposes of article XIV, sections 3 and 4—is not.

It is true that if the county continues with the lease for its full term, the taxpayers will pay as much for the jail facility as if general obligation bonds had been issued. In fact, they almost certainly will pay more, since general obligation bonds probably would have carried a lower interest rate than the somewhat riskier bonds being issued by the Authority. But that fact is not relevant to the legal inquiry—will the technical requirements of the constitution be violated by the proposed transaction?

■ As noted above, so long as the county's liability is limited to the annual rental installment for the current year, only that payment is considered in determining whether article XIV, section 3's debt limitation is exceeded. The full amount due over the term of the lease is not considered. The question here raised is whether the fact that taxes may have to be raised to cover the annual lease payment invalidates the transaction. Article XIV, sections 3 and 4 limit the indebtedness that can be incurred without a vote to "debt [not] in excess of the taxes for the current year." Under our decisions, compliance with this provision requires that the debt contracted for, taken together with all other debts of the county at the time of contracting, cannot exceed the amount of revenue the county anticipates it will receive during the tax year. So long as the anticipated revenues are sufficient to cover the annual payment, the debt incurred is valid under article XIV, section 3. *Muir v. Murray City*, 55 Utah 368, 372–73, 186 P. 433, 434–35 (1919);[5] *Dickinson v. Salt Lake City*, 57 Utah 530, 536–37, 195 P. 1110, 1112 (1921). Thus, the fact that the county will have to raise taxes in order to pay the jail rental does not invalidate the annual rental debt, so long as at the time the county becomes obligated to pay the debt it has sufficient anticipated revenues for that year to pay all of its debts.

■ The constitutional provision defendants next invoke is article VI, section 29 of the Utah Constitution, which provides that "[t]he Legislature shall not authorize ... any county ... to lend its credit or subscribe to stock or bonds in aid of any ... private individual or corporate enterprise or undertaking." Defendants contend that

---

5. In *Fritsch v. Board of Commissioners*, 15 Utah 83, 93, 47 P. 1026, 1029 (1897), this Court ruled that no debt of any kind, whether for salaries or capital improvements, could be incurred unless the municipality has cash in hand to cover the debt. The Court departed from that doctrine over 65 years ago in *Muir v. Murray City*, 55 Utah 368, 186 P. 433 (1919). To the extent that *Fritsch* can be read to impose such a limitation, it can no longer be considered good law.

the county is, in fact, lending its credit to the Authority in violation of this provision. This argument is without merit. The county's credit is not being lent nor is it otherwise at stake. Under the terms of the agreements, the Authority's debts are entirely its own. *See Utah Housing Finance Agency v. Smart*, Utah, 561 P.2d 1052, 1055 (1977); *Spence v. Utah State Agricultural College*, 119 Utah 104, 125, 225 P.2d 18, 30 (1950).

■ Defendants also assert that the Act violates article VI, section 28 of the Utah Constitution, which denies the legislature the power to "delegate to any special commission, private corporation or association, any power ... to perform any municipal functions." Defendants rely on *Backman v. Salt Lake County*, 13 Utah 2d 412, 375 P.2d 756 (1962), for the proposition that the Authority is such a special commission performing a traditional municipal function—providing jail facilities to the county. Assuming that providing a jail is a traditional municipal function, the question is whether the Authority is a "special commission." *Backman*'s language provides some support for defendants. It is, however, distinguishable on its facts. The Civic Auditorium and Sports Arena Act of 1961 struck down in *Backman* gave the special district the power to levy a property tax, while a building authority established pursuant to the Municipal Building Authority Act has no such power.

But going beyond the facts in *Backman*, we decline to follow its restrictive and anachronistic approach—that the constitution, including article VI, section 28, should be construed so as to force governmental attempts to raise capital into the financial straitjacket imposed by article XIV, sections 3 and 4. *See Backman v. Salt Lake County*, 13 Utah 2d at 420–21, 375 P.2d at 760; *accord Carter v. Beaver County Service Area No. One*, 16 Utah 2d 280, 282–83, 399 P.2d 440, 441 (1965); *Barlow v. Clearfield City Corp.*, 1 Utah 2d 419, 428, 268 P.2d 682, 688 (1954) (Henriod, J., dissenting). Instead, we construe the prohibitions of article VI, section 28 narrowly so as to

facilitate flexibility in local government finance. This construction is consistent with the approach taken by this Court in a long line of decisions that predated the *Backman* and *Carter* cases. These earlier cases include *Lehi City v. Meiling*, 87 Utah 237, 48 P.2d 530 (1935); *Patterick v. Carbon Water Conservancy District*, 106 Utah 55, 145 P.2d 503 (1944), *overruled on other grounds*, 690 P.2d 562 (1984); *Barlow v. Clearfield City Corp.*, 1 Utah 2d 419, 268 P.2d 682 (1954); *Freeman v. Stewart*, 2 Utah 2d 319, 273 P.2d 174 (1954). It is also in accord with the general tenor of our decisions construing narrowly the debt limitation provisions in article XIV, sections 3 and 4 when the evils against which they were directed are not present. *See supra* at 277–281.

Under *Lehi City* and its progeny, the Authority clearly is not a "special commission" as that term is used in article VI, section 28. As Justice Wolfe noted in his concurring opinion in *Lehi City*, the coverage of article VI, section 28 must be determined in light of its purpose, *i.e.*, "to prevent interference with local self-government," 87 Utah at 272, 48 P. at 546. In finding that motions of the entity challenged in *Lehi City* did not contravene the purpose of article VI, section 28, Justice Wolfe reasoned:

> In a sense the powers which the water district [challenged in *Lehi City*] enjoys, upon being created, are not delegated to it by the Legislature. The Legislature has not set up an entity and directly given it powers. It has permitted the people of the various cities and towns which are to be included in the territorial limits of the entity to set up such an entity which, when and if they do, may exercise certain powers. If the people choose not to set it up, no powers come into being. The people themselves in the last analysis have control of the situation.

87 Utah at 277–78, 48 P. at 548–49.

Applying these principles to the present case, it is apparent that the evils at which article VI, section 28 is directed are not

present here. First, in permitting the creation of building authorities, the legislature has not removed control over local functions from local government or the people. The legislature has only authorized local governments, at their discretion, to create a building authority. The Iron County Commission chose to exercise this power and created the Authority. The commission has total control over the Authority and, as the Authority's trustees, the commissioners can change the scope of its activities at any time. Local control is thus retained over a locally created entity.

Second, the transaction proposed between the Authority and Iron County will not significantly diminish the ability of Iron County or of its voters to manage their own affairs. The Authority cannot impose a tax nor can it commit the taxpayers to pay for the jail facility. While the voters did not directly authorize the creation of the Authority, they certainly voted for the commissioners, who are free at any time to terminate the lease. And in the event that the county terminates the lease, the bond holders may look to their security, but will have no recourse to the taxpayers or the county. Considering all these factors, we find no diminution in local control over the local governmental process that would warrant a conclusion different than that reached in *Lehi City.*

▆ Having considered the remainder of defendants' challenges to the proposed transaction, we find all but one to be without merit. That one involves the transfer of the old jail and its site to the Authority for a nominal sum. This cannot be done. The county proposes to effect this transfer under authority of sections 17–4–3 and 17–5–48 of the Code. They give a county general authority to own and dispose of property in such manner as it determines to be in the public interest. These sections are analogous to section 10–8–2, which gives the same general powers to municipalities. Like sections 17–4–3 and 17–5–48, section 10–8–2 makes no mention of any consideration that must be received for property disposed of by a city. However,

notwithstanding that silence, we held in *Sears v. Ogden City,* Utah, 533 P.2d 118 (1975), *aff'd on rehearing,* 537 P.2d 1029 (1975), that because public property is held in trust for the use and benefit of the constituents of the owning entity, Ogden City could not dispose of public property other than "in good faith and for an adequate consideration." *Id.* at 119. By parallel reasoning, sections 17–4–3 and 17–5–48 authorize the disposal of county property only for adequate consideration.

Plaintiffs gloss over this problem by asserting that because the county will have the use of a new facility and will reacquire the site in twenty years, the county receives full and adequate consideration for the transfer. This is a speculative and future benefit that cannot suffice to validate a present transfer of the fee. First, it is clear the county will receive no present benefit that reflects the fair market value of the site and building. The county will pay for the use of the jail, once constructed, by way of rents and charges calculated to retire the bonds and cover all operating expenses. No evidence suggests that these charges will be reduced to reflect the value of the old jail and site donated to the Authority by the county.

Second, and more importantly, the fact pivotal to the constitutional validity of the transaction—the county's very real option in any given year of terminating the lease—means that the future benefit relied upon by the plaintiffs is entirely speculative. If the county exercises that option, the almost certain consequence would be a default on the bonds and a foreclosure on the new jail and its site. Under such circumstances, the county would never receive the new jail in fee that plaintiffs rely upon as providing adequate consideration for the transfer of the old jail and site. For the foregoing reasons, we conclude that the proposed transfer of the old jail to the Authority in fee is beyond the county's statutory power.

As an alternative, the county proposes to lease the building site to the Authority for a nominal sum, as permitted by the Act.

U.C.A., 1953, § 11–29–8 (Supp.1985). The Authority will subsequently mortgage this leasehold interest as part of the project, pursuant to section 11–29–11(1)(b). It must be noted that this proposal raises no issue as to whether the *county* may mortgage its property; the sole issue is whether the county may lease the property to the Authority for a nominal consideration, despite the rule discussed above that a county cannot transfer an interest in property without receiving full and fair consideration.[6] The answer is yes.

The Act specifically provides that the county may lease a building site to the Authority for a term which shall not extend beyond the estimated useful life of the project. U.C.A., 1953, §§ 11–29–5(6), –8. It further provides that the county need be paid only a "nominal rental" for the site lease. U.C.A., 1953, § 11–29–8(1) (Supp. 1985). As we have noted, a county cannot rely on the powers conferred by sections 17–5–48 and 17–4–3 to dispose of public property without receiving adequate consideration. However, that limitation results only be reason of the condition on transfers we implied into the statute in *Sears v. Ogden City*, 533 P.2d at 119, and in the earlier part of this opinion. That condition is a wise one, as a general matter, and the legislature has made no move to

alter it. However, it is certainly within the prerogative of the legislature to decide that in certain situations the requirement of adequate consideration should be dispensed with, and that is precisely what it did in enacting section 11–29–8(1). Therefore, notwithstanding *Sears* and the conditions we have today read into sections 17–5–48 and 17–4–3, the county may lease a building site to the Authority in conformity with sections 11–29–5(6) and 11–29–8(1) without receiving adequate consideration for the lease.

The Municipal Building Authority Act is declared to be constitutional and the proposed actions of the county and the Authority to be lawful, with the sole exception that the existing jail site may not be transferred in fee for less than fair and adequate consideration. The decision and order of the district court, with this modification, is affirmed.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.

---

**6.** Under this variant of the proposed transaction, the Authority would mortgage its leasehold interest in the site and the finished building as security for the bonds. Were the county itself mortgaging the fee, there would be a reason to consider whether the mortgage created a constitutionally permissible debt.