**CITY OF WEST JORDAN, et al.,
Plaintiffs and Appellants,**

v.

**UTAH STATE RETIREMENT BOARD,
et al., Defendants and Appellees.**

No. 20078.

Supreme Court of Utah.

Dec. 30, 1988.

Stephen G. Homer, West Jordan, for plaintiffs and appellants.

Mark A. Madsen, Arthur H. Nielsen, and Clark R. Nielsen, Salt Lake City, for defendants and appellees.

ZIMMERMAN, Justice:

Plaintiffs city of West Jordan, the elected mayor and members of the city council, five city employees, and two taxpaying city residents (hereinafter "West Jordan") appeal from an order granting summary judgment for defendant Utah State Retirement Board ("the Board"). The district court rejected a variety of constitutional challenges mounted by West Jordan to portions of Senate Bill 327, which was passed by the 1983 legislature, and to certain portions of the underlying statutes governing the state retirement system. These challenges largely center around amendments that S.B. 327 made to the various state retirement programs participated in by West Jordan, amendments that expressly deny municipalities participating in these programs as of January 1, 1982, the right to withdraw from membership in the system. We affirm.

In 1961, the Utah State Legislature created a retirement system for all employees of the state and its subdivisions. *See* 1961 Utah Laws chs. 100–02. Political subdivisions of the state were presumed to be members of the system but were free to opt out of the plan. *Id.* at §§ 5–6. Shortly thereafter, West Jordan's city council passed a resolution that took advantage of this option. However, in 1968 the city reversed itself and joined the general state retirement system. In 1979, the city also joined Utah's public safety retirement system and, at the same time, enlarged its participation in and coverage under the general state retirement system. The city relied entirely on the state system to provide retirement benefits for its employees until December of 1981, when the city obtained supplemental retirement benefits for some of its employees from Beneficial Life Insurance Company ("Beneficial Life"). In June of 1982, the city council voted to rescind the resolutions of 1968 and 1979 requesting membership in the state retirement system. West Jordan claimed that the effect of this action was to withdraw the city entirely from participation in the state retirement system.

Senate Bill 327 was passed by the legislature in 1983, apparently in response to attempts by West Jordan and other political subdivisions to withdraw from the system. It continued the presumption that each political subdivision of the state is a member of the system, but explicitly provided that any entity which was a member as of January 1, 1982, cannot opt out of the system and must continue to meet its requirements. 1983 Utah Laws ch. 224, § 11; Utah Code Ann. § 49–10–11(1), (2) (Supp. 1983) (now codified at Utah Code Ann. §§ 49–2–204, 49–3–204 (Supp.1987)). Any political subdivision that was not a member as of January 1982 can elect to be excluded from the system only if it does not choose to provide any retirement benefits to its employees. If it chooses to provide benefits, it must do so through the state retirement system.[1] 1983 Utah Laws ch. 224, § 11; Utah Code Ann. § 49–10–11(2) (Supp. 1983) (now codified at Utah Code Ann. §§ 49–2–204, 49–3–204 (Supp.1987)).

In response to the passage of S.B. 327, West Jordan filed the present action, seek-

---

1. Senate Bill 327 also contains a number of other amendments to the Utah State Retirement Act that are not at issue here. The principal amendments involved in this case are S.B. 327's express requirements that participating municipalities remain in the retirement system and that municipalities wishing to provide retirement benefits to employees participate in the retirement fund, as well as the bill's definition of "full participation" and its express authorization of supplemental coverage from sources other than the retirement fund. *See* 1983 Utah Laws ch. 224, §§ 3, 6, 11, 12; Utah Code Ann. §§ 49–6a–8.1, 49–10–11(1)–(2), (5)–(6), 49–11–14(1), (4), (5) (Supp.1983) (now codified at Utah Code Ann. §§ 49–2–204, 49–3–204, 49–4–204, 49–5–204 (Supp.1987)).

**532**

ing a declaratory judgment that the provisions of the bill and some of the provisions of the underlying retirement system statutes violate both the state and federal constitutions. The trial court rejected these arguments in a memorandum decision denying West Jordan's motion for summary judgment. The trial court then granted the Board's motion for summary judgment, upholding the challenged provisions of S.B. 327 and of the underlying retirement system statutes. On appeal, West Jordan reasserts a number of the claims raised below.

Before reviewing these claims, we note that the appeal before us presents questions of law only. Therefore, we review the legal conclusions supporting the summary judgment for correctness. *E.g., Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887 (1988); *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

█ Underlying many of West Jordan's challenges to the constitutionality of S.B. 327 is the claim that by denying members the right to withdraw unilaterally from participation in the retirement system, S.B. 327 alters system members' rights and obligations. West Jordan's premise is that it had the right to withdraw at will from participation in the system before the passage of S.B. 327. To the extent that this premise is unsound, we need not address arguments based on it.

When the city petitioned to join the state retirement system in 1968, the statutes creating that system were silent on the right of members to withdraw. The question, then, is whether that silence indicates legislative intent either to grant or to deny members the right to withdraw. From the system's inception, its design has been such that certainty and stability of membership is necessary to achieve the actuarial soundness sought by the legislature. This objective could easily be imperiled if political subdivisions that had joined the

system were free to withdraw at any time. This suggests that under the terms of the original statute, no such right was intended to be given to those opting to join the system. Confirmatory evidence of this intention is the application form the city filed in 1979 to expand its participation in the retirement system and to join the public safety retirement system. That application plainly states that enrollment in the system is permanent and members may not withdraw. Finally, S.B. 327 states in its preamble that it is a clarification of the laws as they exist. *See* 1983 Utah Laws ch. 224 preamble. Under these circumstances, we conclude that legislative silence at the time the system was created does not indicate that members would be free to withdraw at any time. Rather, we conclude that this silence should be interpreted as indicating that once a local unit of government had joined the system, withdrawal was not permitted. Therefore, the city never had the right to withdraw unilaterally from participation in the system, and we find no merit in West Jordan's claims to the extent that they are based on the presumption that members could freely withdraw from the system prior to S.B. 327's enactment.

█ Moving on to West Jordan's remaining challenges, we begin with the presumption of validity that must be accorded legislative enactments when attacked on constitutional grounds. The burden is on those who would have us strike down an act. *See, e.g., Lehi City v. Meiling*, 87 Utah 237, 246–47, 48 P.2d 530, 535 (1935). In that light, we first consider West Jordan's claim that S.B. 327 and the underlying retirement statutes [2] violate article VI, section 28 of the Utah Constitution, which denies the legislature authority to "delegate to any special commission, private corporation or association, any power ... to perform any municipal functions." Utah Const. art. VI, § 28. This argument takes several forms. First, West Jordan focuses on the fact that as a result of the changes made by S.B. 327, if any municipality chooses to provide

2. West Jordan's article VI, section 28 claims appear to be based in part on the provisions of the retirement act that set forth the Board's existence and duties. *See* Utah Code Ann. §§ 49–9–1 to –3, –7, –8, –11, 49–10–9, –15 (1982 & Supp.1983).

retirement benefits to its employees, it must become a member of the state retirement system and offer at least the benefits required of system members. West Jordan seems to contend that somehow the fact that membership in the state system is now mandatory rather than voluntary amounts to a violation of article VI, section 28. This claim is meritless.

Article VI, section 28 prohibits only the legislature's delegating certain powers relative to municipal matters to a special commission. By requiring that municipalities offering retirement benefits do so in part through the state retirement system, the legislature has not delegated any powers to anyone; it has simply regulated how municipalities must perform a function, if they choose to do it at all. Article VI, section 28 is not implicated by this fact alone. Therefore, the validity of the Board's place in the retirement system is unaffected by the mandatory membership provision of S.B. 327.

■ West Jordan's second argument under article VI, section 28 is directed against delegating to the Board responsibility to operate a retirement program that covers municipal employees. West Jordan contends that the Board is a "special commission" and that the provision of retirement benefits to municipal employees is a "municipal function." For the purposes of argument, we will assume that the Board constitutes a "special commission," although the Utah cases do not give this term any clear meaning. *See, e.g., Tygesen v. Magna Water Co.,* 119 Utah 274, 279–81, 226 P.2d 127, 129–31 (1950); *Lehi City v. Meiling,* 87 Utah at 272–79, 48 P.2d at 546–49; *Logan City v. Public Util. Comm'n,* 72 Utah 536, 566–69, 271 P. 961, 972–73 (1928); *id.* at 574, 271 P. at 975 (Gideon, J., concurring); *id.* at 577, 271 P. at 976 (Woolley, District Judge, concurring).

The central question, then, is whether the Board is performing a "municipal function" within the meaning of article VI, section 28. A brief background on that section will be helpful. Article VI, section 28 is termed a "ripper clause." *See generally*

Porter, *The Ripper Clause in State Constitutional Law: An Early Urban Experiment—Parts I and II,* 1969 Utah L.Rev. 287, 450 [hereinafter "Porter"]. Its prototype first appeared in Pennsylvania in the late 19th century, and it was subsequently adopted by a total of eight states over the next few years. *Id.* at 306–11 & nn. 147–50. The motivation for the Pennsylvania clause was to protect local government councils from having their particularly local functions usurped by special boards or commissions that were unrepresentative and were often created by the state legislature at the behest of special interests. *Id.* at 306–11.

These ripper clauses, although often written in virtually identical language, have been given different interpretations in different states and often within one state at different times. *See id.* at 310–11 & nn. 147–50, 481–90. This is understandable to some extent because, for example, conceptions of what constitutes an area of uniquely local concern that ought to be under the control of local government—the concept underlying the ban on delegating the "perform[ance of] any municipal functions"— has varied among states and over time. *See* Utah Const. art. VI, § 28; Porter at 485 & nn. 178, 179. Particularly apt here is a quotation from Porter in which he discusses the indeterminacy of the meaning given other state constitutional provisions designed to restrict legislative action with respect to subjects described variously as "local affairs," "municipal purposes," or "corporate purposes":

> Although such phrases were meant to serve as standards for the courts in determining the areas of city action protected from legislative interference, they have been of limited value because the only meaning that can be given to the words "local" and "municipal" on their face is geographical rather than legal. Since a geographical definition would allow cities complete freedom to act within their boundaries, which would completely disrupt state government, the final determination as to what is "local" or "municipal" is thrust upon the judges, "who

have no guides to decision except the often conflicting views of other states." The result has been that the phrases "local affairs" and "municipal functions" have simply not gained any empirical meaning, even after a century of interpretation.

Porter at 295 (footnotes omitted).

This sort of uncertainty fairly characterizes the case law that purports to give meaning to the term "municipal functions" in article VI, section 28. A review of our decisions provides relatively little by way of a consistent analytical framework for determining how to characterize a given area of activity. *See* Porter at 473–78 & nn. 123, 128, 135, 140 (canvassing all Utah cases decided before 1969); *see also Salt Lake City v. International Ass'n of Firefighters Locals 1645, 593, 1654, and 2064,* 563 P.2d 786, 791 (Utah 1977) (Crockett, J., concurring) (stating that "municipal function" merely means "public function" and is not in any way distinct from the term "state function"). *Compare, e.g., Municipal Bldg. Auth. v. Lowder,* 711 P.2d 273, 281–82 (Utah 1985) (assuming *arguendo* that building a jail is a municipal function) *with Tribe v. Salt Lake City Corp.,* 540 P.2d 499, 502–03 (Utah 1975) (finding that construction of a parking facility is a state rather than a municipal function) *and Salt Lake County v. Murray City Redevelopment,* 598 P.2d 1339, 1342–43 (Utah 1979) (relying on *Tribe* for the proposition that fighting urban blight by means of redevelopment plans is a state rather than a municipal function) *and International Ass'n of Firefighters,* 563 P.2d at 788–89 (holding that providing firefighting services is a state rather than a municipal function and stating the same of police and health protection). However, our more recent cases, such as *Tribe* and *International Ass'n of Firefighters,* reflect an increasing willingness to recognize that many functions traditionally performed by municipalities may be sufficiently infused with a state, as opposed to an exclusively local, interest to escape characterization as "municipal functions" for purposes of article VI, section 28. This appears to be the approach advocated by Porter. *See* Porter at 486–87.

Given that the cases establish no bright line test for determining whether a function is municipal and that no Utah cases have considered a situation factually analogous to the retirement system at issue, we must at least articulate our approach to this characterization issue. We reject, as a general matter, the search for any hard and fast categorization of specific functions as "municipal" or "state." Instead, in determining whether a function is municipal, we think it appropriate to take a balancing approach, one which considers a number of factors that are pertinent to the specific legislation at issue. These include, but are not limited to, the relative abilities of the state and municipal governments to perform the function, the degree to which the performance of the function affects the interests of those beyond the boundaries of the municipality, and the extent to which the legislation under attack will intrude upon the ability of the people within the municipality to control through their elected officials the substantive policies that affect them uniquely. This last factor should serve to ensure due deference to a paramount purpose of the ripper clause, as it has been interpreted in Utah: " 'to prevent interference with local self-government.' " *Municipal Bldg. Auth. v. Lowder,* 711 P.2d at 281 (quoting *Lehi City v. Meiling,* 87 Utah at 272, 48 P.2d at 546). This sort of balancing approach is best suited to accomplishing the purposes of the ripper clause without erecting mechanical conceptual categories that, without serving any substantial interest, may hobble the effective government which the state constitution as a whole was designed to permit.

The foregoing approach leads us to conclude that the retirement system statutes do not delegate to the Board the performance of a "municipal function." First, the state certainly has a legitimate interest in determining the minimum level of retirement benefits provided to public employees by its political subdivisions, among others. Presumably, in the absence of the ripper clause, it could fix such minimums and require all political subdivisions to meet

them under its general welfare power.[3] It has so far chosen to permit local subdivisions to decline to offer retirement benefits. That does not, as West Jordan argues, amount to an acknowledgment that it is a municipal affair beyond the state's power; rather, it is simply an accommodation to local government that may be considered in appraising the legislation's intrusiveness.

The state also has another legitimate interest beyond the level of benefits provided retirees. The financial soundness of retirement systems into which monies attributable to employees are paid, including systems serving only governmental employees, is certainly a legitimate subject of statewide concern. The legislature has chosen to further this interest by establishing a statewide retirement system for all government employees and by requiring that any political subdivisions offering retirement benefits do so through the state system, the actuarial soundness and financial integrity of which the legislature is assured through the activities of the Board.

As for the relative abilities of state and local government to perform the function of providing a financially sound retirement program, there is every reason to believe that the state, by consolidating funds from many smaller political subdivisions and providing for continuity and expertise in the management of the funds, can do a better job than each separate local unit of government.

Finally, there is the critical question of the challenged legislation's degree of intrusiveness on local officials' control of policies that uniquely affect their citizenry. The legislation at issue leaves local units of government with complete autonomy in deciding whether to offer any retirement benefits. It also permits the local governments to provide additional benefits over and above those provided by the state system. All it requires is that a local unit of government that chooses to offer retirement benefits do so through the state system at a specified minimum level. That is the only respect in which the legislation could be said to interfere with control over uniquely local matters. On the other hand, the Board, the agency charged with the management of the retirement systems, cannot be said to intrude in any significant way in the day-to-day functioning of local government; it simply manages the funds in an actuarily sound fashion and pays benefits. On balance, we conclude that the level of intrusiveness on local self-government resulting from this legislation is minimal and does not warrant our holding that the policies underlying the ripper clause are affected. Therefore, we find that the legislation does not delegate the performance of a municipal function to the Board, as West Jordan claims.

■ West Jordan next claims that article XI, section 5 of the Utah Constitution requires that any classification of municipali-

3. Examples of the legislature's exercise of its general welfare power in the area of employment benefits include the Workers' Compensation Act, Utah Code Ann. §§ 35–1–1 to –107 (1988), the Occupational Disease Disability Act, id. §§ 35–2–1 to –65, and the Unemployment Compensation Act, id. §§ 35–4–1 to –26. These provisions, which require employers to provide certain benefits analogous to retirement compensation, apply to political subdivisions as well as to private employers. See id. §§ 35–1–42(1), 35–2–10(a), 35–4–8.5(a). With respect to unemployment compensation, the legislature has expressly declared the following public policy:

Economic insecurity ... is a serious menace to the health, morals, and welfare of the people of this state.... The Legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment

of this measure, under the police power of the state....

Id. § 35–4–2. This exercise of the police power was tacitly upheld in Singer Sewing Mach. Co. v. Industrial Comm'n, 104 Utah 175, 189, 134 P.2d 479, 485, reh'g denied, 104 Utah 196, 141 P.2d 694 (1943). This Court has also upheld both of the other acts against various constitutional challenges. See, e.g., Masich v. United States Smelting, Ref. & Mining Co., 113 Utah 101, 123–27, 191 P.2d 612, 623–25, appeal dismissed, 335 U.S. 866, 69 S.Ct. 138, 93 L.Ed. 411 (1948) (Occupational Disease Disability Act); United Air Lines Transp. Corp. v. Industrial Comm'n, 107 Utah 52, 61–62, 151 P.2d 591, 595 (1944) (Workers' Compensation Act). Moreover, it could be argued that the legislature has plenary power over all conditions of employment in the state, whether public or private, regardless of the ripper clause. See Utah Const. art. XVI, § 8.

ties must be on the basis of population only. West Jordan contends that because sections 49–11–23 and 49–6a–15 of the Code, which establish specific contribution rates to the state retirement system for designated municipalities, classify municipalities on a basis other than population, those statutes are unconstitutional. *See* Utah Code Ann. §§ 49–6a–14, 49–11–23 (1982 & Supp.1983) (now codified at Utah Code Ann. §§ 49–4–301, 49–5–301 (Supp. 1988)).

In order to assess West Jordan's challenge, we must first determine the scope of article XI, section 5. The language upon which West Jordan relies for its claim that all distinctions between municipalities must be based on population is underlined in the following quotation of the first two sentences of article XI, section 5:

> Corporations for municipal purposes shall not be created by special laws. *The legislature* by general laws *shall provide for* the incorporation, organization and *classification of cities and towns in proportion to population,* which laws may be altered, amended or repealed.

Utah Const. art. XI, § 5 (emphasis added).

▅ We think that West Jordan takes the emphasized words out of context. This language is not a general ban on the classification of municipalities on any grounds other than population.[4] Rather, it is simply part of a provision establishing guidelines and limitations on the legislature's powers when it acts to provide for the organization of municipalities. The classification-on-the-basis-of-population requirement of article XI, section 5 only applies to laws that classify municipalities for the purpose of defining their powers and functions and directs

that if such laws make distinctions between the powers of various municipalities, those distinctions must be on the basis of population only. Our review of the state constitution and relevant precedent has revealed no authority that contradicts this interpretation of article XI, section 5, and West Jordan has cited none. *Cf. Towler v. Warenski,* 59 Utah 171, 174–77, 202 P. 374, 376–77 (1921) (stating that the legislature has the power to classify cities for purposes of city elections according to population, but that it must provide some method for changing from one class to another with shifts in population); *People v. Page,* 6 Utah 353, 355–56, 23 P. 761, 761–62 (1890) (determining that city officials should be elected as provided in a statute that classified cities according to population rather than as provided in the city charter); 1 E. McQuillin & C. Keating, *The Law of Municipal Corporations* §§ 3.07, 3.08 (3d ed. 1987); 2 E. McQuillin, C. Keating & S. Flanagan, *The Law of Municipal Corporations* §§ 4.68–4.70, 4.73–4.74 (3d ed. 1988) (indicating that constitutional provisions similar to Utah's typically relate only to laws that define the powers and functions of municipalities). For this reason, we conclude that article XI, section 5 does not apply to the distinctions made by sections 49–11–23 and 49–6a–15.

▅ West Jordan raises a number of other claims of unconstitutional classification in the retirement system's statutory contribution rate schedule, which is set out in sections 49–6a–15 and 49–11–23 and differentiates between some municipalities. *See* Utah Code Ann. §§ 49–6a–15, 49–11–23 (Supp.1983) (now codified at Utah Code

---

4. In fact, a statutory classification based on population may violate the other provisions of our state constitution that require laws to be uniform and general, Utah Const. art. I, § 24; *id.* art. VI, § 26, if population is unrelated to the statute's purpose. *See, e.g., Saville v. Corless,* 46 Utah 495, 496–98, 151 P. 51, 51–52 (1915); *Love v. Liddle,* 26 Utah 62, 65–69, 72 P. 185, 186–87 (1903); *Laman v. Harrill,* 233 Ark. 967, 969–73, 349 S.W.2d 814, 816–18 (1961); *Waybright v. Duval County,* 142 Fla. 875, 879–81, 895–901, 196 So. 430, 432–33, 439–41 (1940); *Berentz v. Board of Commissioners of Coffeyville,* 159 Kan. 58, 64–66, 152 P.2d 53, 57–58 (1944); 2 E.

McQuillin, C. Keating & S. Flanagan, *The Law of Municipal Corporations* § 4.74 (3d ed. 1988); *see also Board of Education of Ogden v. Hunter,* 48 Utah 373, 383–87, 159 P. 1019, 1022–24 (1916) (holding a classification based on population and total assessed property valuation unconstitutional as a special and nonuniform law); *cf. Hulbert v. State,* 607 P.2d 1217, 1223–24 (Utah 1980) (quoting *Utah Farm Bureau Ins. Co. v. Utah Ins. Guaranty Ass'n,* 564 P.2d 751, 754, 755–56 (Utah 1977), for the proposition that legislative classifications must be reasonable and must be related to the legislation's purpose).

Ann. §§ 49–4–301, 49–5–301 (Supp.1988)). West Jordan's attack is facial, i.e., it merely says that the distinctions exist and therefore they must be invalid. By failing to support its argument with any reasoning or authority, West Jordan would have us shift the burden of justifying these distinctions to the Board.

When considering challenges to matters of economic regulation that do not affect specially protected interests, we give deference to the legislature's judgment as to classifications needed to achieve the ends sought. *See, e.g., Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d at 888 (interpreting article I, section 24 of the Utah Constitution and section 10–8–80 of the Utah Code) (citing *Baker v. Matheson*, 607 P.2d 233, 244 (Utah 1979); *State v. Taylor*, 541 P.2d 1124, 1125–26 (Utah 1975), *questioned on other grounds, Consolidation Coal Co. v. Emery County*, 702 P.2d 121, 125–27 (Utah 1985); *Menlove v. Salt Lake County*, 18 Utah 2d 203, 209, 418 P.2d 227, 231 (1966)). To strike down such legislation, we must find that the means are not reasonably related to the achievement of a legitimate legislative purpose, *see Mountain Fuel*, 752 P.2d at 887, 890, and the burden is on the party attacking the legislative enactment to show that it offends the constitution. This is a burden that West Jordan has wholly failed to carry. Therefore, extensive analysis is not necessary to defeat its claim. It is enough to say that it appears that each of the distinctions in sections 49–6a–15 and 49–11–23 is a recognition of actuarial experience and that these distinctions account for existing differences among certain groups of employees and among a few municipalities. As such, in the absence of a showing by West Jordan to the contrary, we assume that they are reasonably related to the maintenance of an actuarially sound system for the provision of retirement benefits to municipal employees. *See, e.g.*, S.B. 191, 38th session Utah Legislature, House of Representatives' Debates, 59th day (Mar. 12, 1969), discs 9 (positions 12–27), 10 (positions 0–17), 11 (positions 4–6) (discussing the different rates at which the affected state and municipal retirement funds were accumulating deficits and the appropriateness of different contribution rates to reducing the deficits and making the funds actuarially sound).

West Jordan's next claim is that the effect of S.B. 327 is to impair the city's contractual relations with either the Board or Beneficial Life in violation of article I, section 10 of the federal constitution and article I, section 18 of the Utah Constitution. *See* U.S. Const. art. I, § 10;[5] Utah Const. art. I, § 18.[6] Specifically, West Jordan argues that S.B. 327 alters its contractual relationship with the Board by prohibiting unilateral withdrawal. We find no merit to this argument because, as has been explained above, we conclude that West Jordan has never had the right to withdraw.

Also without merit is West Jordan's claim that its contract with Beneficial Life is impaired by S.B. 327. First, as noted, West Jordan did not have that right when it entered its agreement with Beneficial Life in 1981. Second, West Jordan is not now, nor has it ever been, prohibited from obtaining supplemental coverage from any private source, including Beneficial Life, as it has done in the past.

Finally, without citation to any factual findings of the trial court, any statutory or constitutional provisions, or any case law, counsel for West Jordan claims that from time to time the legislature has raided the retirement fund to use the money for general state purposes and that this is improper. The record does not support this claim; therefore, we do not address it. But in declining to consider this claim, we certainly do not mean to suggest that any such diversion of retirement funds would be permissible.

We have considered all of West Jordan's other claims and find them to be without

---

5. "No State shall … pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10.

6. "No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be passed." Utah Const. art. I, § 18.

merit. We find no issue of material fact sufficient to preclude summary judgment. For the reasons stated, we affirm.

HALL, C.J., HOWE, Associate C.J., and STEWART, and DURHAM, JJ., concur.